# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 11, 2005 Session

## RABIA KAFOZI, ET AL. v. WINDWARD COVE, LLC.

**Appeal from the Chancery Court for Hamilton County**
No. 02-0336     Howell N. Peoples, Chancellor

**Filed August 26, 2005**

**No. E2004-01791-COA-R3-CV**

Rabia Kafozi and Audry C. Kafozi ("Plaintiffs") signed an installment sales contract to purchase real property from Windward Cove, LLC ("Defendant"). Plaintiffs made some, but not all of the payments as scheduled. Defendant declared a default and then sold the real property to another party. Plaintiffs sued Defendant seeking, among other things, either specific performance or the return of payments made by them. The case was tried and the Trial Court held, *inter alia*, that the installment sales contract did not set a due date and, therefore, Plaintiffs never were in default. Defendant appeals claiming the Trial Court erred in interpreting the installment sales contract. We reverse, and dismiss Plaintiffs' claims.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Plaintiffs' Claims Dismissed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

John R. Anderson and Robert S. Grot, Chattanooga, Tennessee, for the Appellant, Windward Cove, LLC.

John E. Eberly, Chattanooga, Tennessee, for the Appellees, Rabia Kafozi and Audry C. Kafozi.

# OPINION

## Background

Plaintiffs and Defendant signed an Installment Sales Contract ("the Contract") in January of 2000. Under the Contract, Plaintiffs were to purchase Lot 37 in the Windward Pointe Subdivision located in Hamilton County, Tennessee ("Lot 37") from Defendant. In pertinent part, the Contract provides:

> 2. **Purchase Price.** [Plaintiffs] agree[] to pay therefor the sum of One Hundred Thousand Dollars ($100,000.00) to be payable as follows:
>
> (a) Twenty-five Thousand Dollars ($25,000) on the signing of this agreement, which is non-refundable in any event, the receipt of which is hereby acknowledged; and
>
> (b) Two Thousand Dollars ($2,000.00) on March 10, 2000, and on the tenth (10th) day in each and every month thereafter for twelve (12) months until February 10, 2001, when the balance of the purchase price shall become due and payable, regardless of loss, destruction or damage to any of the improvements thereon, if any; provided, however, [Plaintiffs] can extend for an additional six (6) months upon written notice to [Defendant]. For every month beyond the eighteen (18) months above-stated, [Plaintiffs] will pay a penalty of five percent (5%) figured on an annual basis of the unpaid balance till paid.
>
> * * *
>
> 4. **Default by [Plaintiffs].** In the event that the [Plaintiffs] shall make default in any way of the covenants herein contained, or shall fail to make the payments aforesaid at the times specified, the times of payment being declared to be the essence of this agreement, if [Plaintiffs] default[] and such defaults are not cured within ten (10) days, then the [Defendant] may declare this agreement null and void. Upon default, [Plaintiffs] forfeit[] all payments and any and all rights to the Property.
>
> * * *
>
> 7. **Construction.** No later than twelve (12) months from the final payment date, [Plaintiffs] agree[] to enter into a construction agreement with CDM & Associates, Inc., or its designee, for the construction of a residence on the Property, upon reasonable terms and conditions, including, but not limited to providing that construction must commence within twelve (12) months of the date this contract is closed and title passes to [Plaintiffs]. Failure to do so by [Plaintiffs] will be a breach of this Agreement.

Plaintiffs made the $25,000 initial payment and the first twelve months' worth of payments, although not exactly as scheduled. Plaintiffs availed themselves of the additional six months extension to pay the balance of the purchase price as provided by the Contract. Defendant then granted Plaintiffs an additional six month extension to pay the balance of the purchase price. Plaintiffs still did not pay the balance of the purchase price at the end of the second six month extension. In February of 2002, Defendant sent Plaintiffs a certified letter stating that "this letter constitutes notice of payment default and a demand for payment in the amount of $46,455.85. If payment is not received within 10 days as provided in the Installment Sales Agreement, [Defendant] will exercise its rights to terminate the Agreement." Plaintiff Audry Kafozi signed for receipt of this letter on February 15, 2002.

In March of 2002, Plaintiffs sued Defendant requesting the Trial Court to, among other things, issue an order either to require Defendant to convey to Plaintiffs Lot 37 upon receipt of the balance of the purchase price, or to require Defendant to return to Plaintiffs the money paid by them under the contract with interest. In April of 2003, Plaintiffs moved the Trial Court for permission to add Pamela M. Mabee as a party defendant claiming that Ms. Mabee was related to Danny Mabee who was, or had been, an officer of Defendant and that the property was sold to Ms. Mabee in a "'sweetheart' deal to keep Plaintiffs from acquiring the premises." The Trial Court entered an order in June of 2003 allowing Plaintiffs to amend their complaint to add Pamela M. Mabee as a party defendant.

The case was tried in June of 2004. At trial, Richard J. Ebersole, chief manager and owner of two-thirds of Defendant Windward Cove, LLC testified. Mr. Ebersole testified that Dale Mabee, who at one time was a one-third owner of Defendant Windward Cove, LLC, signed the Contract for Defendant. Mr. Ebersole testified that during the first twelve months of the Contract, Plaintiffs made irregular payments, but they eventually did pay all of the $24,000 due for those twelve months, and that he granted Plaintiffs two extensions to pay the balance.[1]

Mr. Ebersole testified he sold Lot 37 to Pamela Mabee on February 27, 2002, some twelve days after Plaintiff Audry Kafozi had signed for receipt of the default letter, and therefore the sale to Pamela Mabee was after the ten day default period had passed. He testified that he received a phone call from a Mr. Bourne at Cornerstone Bank on February 28, the day after he sold the property, and that he told Mr. Bourne that it was too late for the Plaintiffs to pay because the deadline had passed. Mr. Ebersole testified: "I was unaware of any activity on a loan prior to the call I received from Mr. Bourne . . . ." Mr. Ebersole further testified he does not believe he had any communications from anyone regarding Lot 37 during the ten day default period and stated: "I just - - I can't recall whether anybody called me between - - I don't have any recollection of having been contacted between February the 13th and February the 25th or the 27th. The first communication I can recall was the 28th of February." However, Mr. Ebersole later admitted that he went to Mr. Kafozi's office on February 15 or 16 and spoke with Mr. Kafozi regarding the payment and that he also later spoke with Mr. Kafozi on the phone.

---

[1] We note that the Contract gave Plaintiffs the right to the first six month extension.

Mr. Ebersole testified that "Mike Bourne contacted me on the 28th because it was the day after the sale." Mr. Ebersole further stated that even when he spoke with Mr. Bourne of Cornerstone Bank, "I was never given any evidence of any kind of any loan commitment from any lender." Mr. Ebersole stated:

> I would benefit far more from the [Plaintiffs] maintaining that lot, purchasing that lot and letting them build a house than I would from selling the lot to anybody else. It was only because they could not come up with the money, and their banker gave me no comfort, evidence, of any kind that he was in a position to make a commitment when he called me after the deadline passed.

Plaintiff Rabia Kafozi testified that after he and his wife received the default letter, Mr. Ebersole came to his office and told him their time was up. Mr. Kafozi testified that he replied:

> No, my time is not up. Our agreement clearly says that if I don't pay because of religious reasons I couldn't pay interest unless I have to. So I told him, the 18-month period that we did not pay interest, I didn't have to pay interest, but now I do, so I can pay you the 5 percent, and I clearly told him not to write it in the Contract, not to write interest, penalty, so I can pay the 5 percent penalty, and then I said, By the way, I mean I needed to - - I had the payment of $10,000 in the office to pay to him. And then he said, I'm sorry, I cannot take your payment, I need the whole sum right now.

Mr. Kafozi testified that at that time, Mr. Ebersole suggested Plaintiffs get a loan. Mr. Kafozi testified that on that same day, after speaking with Mr. Ebersole, Mr. Kafozi called Cornerstone Bank to apply for loan. Mr. Kafozi testified he delivered his financial statements to Cornerstone Bank the next morning, which was three days after Plaintiffs received the default letter. Mr. Kafozi testified that he then received a call from Cornerstone Bank requesting the address of the property, and so he called Mr. Ebersole immediately and obtained this information. Mr. Kafozi testified that Mr. Bourne from Cornerstone Bank then called him the next day asking for the lot number. Mr. Kafozi stated that this phone call occurred four days after Plaintiffs received the default letter. Mr. Kafozi testified that at this time, he gave Mr. Ebersole's phone number to Mr. Bourne. Mr. Kafozi testified that Mr. Bourne called him again later that same day, four days after Plaintiffs received the default letter, and told him to call Mr. Ebersole. Mr. Kafozi testified that he and his wife attempted to reach Mr. Ebersole and finally were able to do so later that evening, at which time Mr. Ebersole told them that the property already was sold. Mr. Kafozi testified that everything happened within the week, "we didn't get the weekend." Mr. Kafozi also testified that he was able to get the loan and would have been able to complete the purchase. However, no one from Cornerstone Bank testified regarding whether Plaintiffs ever were approved for a loan and Plaintiffs admitted that they themselves did not have the money to pay the balance due.

The Trial Court entered an order on June 17, 2004, granting judgment in favor of Plaintiffs and awarding Plaintiffs $54,500 plus interest at 10% per annum from February 27, 2002. The Trial Court based its decision solely on its interpreting the Contract in a manner so that the

Contract did not provide a due date for the payment by Plaintiffs of the balance of the purchase price. The June 17 order also dismissed Plaintiffs' claim against Pamela Mabee.

## **Discussion**

Although not stated exactly as such, Defendant raises one issue on appeal: whether the Trial Court erred in interpreting the Contract not to provide a due date for the payment by Plaintiffs of the balance of the purchase price and, then holding as a result of that interpretation that Plaintiffs did not breach the Contract by not paying the balance of the purchase price. Plaintiffs' sole argument in response is that the Trial Court correctly interpreted the Contract.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)(citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d, *Contracts*, § 245).

This Court's initial task in construing the Contract at issue is to determine whether the language of the contract is ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id.* A contract is ambiguous only when its meaning is uncertain and may *fairly* be understood in more than one way. *Id.* (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the parties. *Id.* Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id.*

In this case, the Contract provides that Plaintiffs would make a down payment, then make monthly payments for a twelve month period:

-5-

until February 10, 2001, when the balance of the purchase price shall become due and payable, regardless of loss, destruction or damage to any of the improvements thereon, if any; provided, however, [Plaintiffs] can extend for an additional six (6) months upon written notice to [Defendant]. For every month beyond the eighteen (18) months above-stated, [Plaintiffs] will pay a penalty of five percent (5%) figured on an annual basis of the unpaid balance till paid.

Our initial task is to determine if this language in the Contract is ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890. The Contract clearly provides that Plaintiffs were to make payments "until February 10, 2001, *when the balance of the purchase price shall become due and payable . . . .*" (emphasis added). The Contract further provides "[Plaintiffs] can extend for an additional six (6) months upon written notice to [Defendant]."

The Contract clearly provided for a date, February 10, 2001, when the balance of the purchase price was due. The Contract then provided for a six month extension of this due date triggered by Plaintiffs providing written notice of the extension. Even given the second six month extension granted by Defendant beyond what Plaintiffs were entitled to under the Contract, the Contract still provided for a date certain when the balance of the purchase price would be due. Taking the two six month extensions into consideration, the due date when the balance of the purchase price was due and payable was February 10, 2002. The Contract is clear and unambiguous.

The provision providing for a 5% penalty for every month beyond the original 18 months does not eliminate the specific due date set in the Contract. Rather, this provision acts only as a penalty clause to provide Defendant with an additional remedy if Plaintiffs did not pay by the extended due date eighteen months out. The penalty clause simply provided for an additional amount to be owed to Defendant if Plaintiffs did not pay by the extended due date. It clearly was the intent of the parties to provide both a set due date and for an additional cost to Plaintiffs if Plaintiffs did not pay the balance by the extended eighteen month due date set in the Contract. This penalty provision in no way removed Defendant's right to declare a default if Plaintiffs failed to pay the balance of the purchase price on the due date. We find no ambiguity in these provisions of the Contract.

The Contract also provides:

In the event that the [Plaintiffs] shall make default in any way of the covenants herein contained, or shall fail to make the payments aforesaid at the times specified, the times of payment being declared to be the essence of this agreement, if [Plaintiffs] default[] and such defaults are not cured within ten (10) days, then the [Defendant] may declare this agreement null and void.

Plaintiffs failed to make the final payment of the balance of the purchase price by February 10, 2002. Defendant clearly had the right to declare a default, and Defendant chose to exercise this right and sent Plaintiffs the default letter. Under the Contract, Plaintiffs had ten days to cure the default.

-6-

Plaintiffs did not tender payment within those ten days and failed to cure the default within the ten days as allowed under the Contract.

Mr. Kafozi testified that he and his wife were told before the ten day cure period had elapsed that the property already had been sold to another party. Unfortunately however, the only evidence in the record regarding when the property actually was sold is Mr. Ebersole's testimony that he sold Lot 37 to Ms. Mabee on February 27, twelve days after Plaintiff Audry Kafozi signed for the default letter. In addition, no one from Cornerstone Bank testified regarding whether Plaintiffs ever were approved for a loan, and Plaintiffs admitted they did not have the money themselves to pay the balance due. Perhaps even more importantly, Plaintiffs did not raise this argument anywhere in their brief in this appeal. Plaintiffs, instead, raised only one argument with that argument being that the Trial Court's interpretation of the Contract that there was no set due date for Plaintiffs to pay the balance of the purchase price was correct.

We hold that the Trial Court erred in its interpretation of the Contract. The Contract is clear and unambiguous and the intent of the parties clear. The Contract did provide a due date for Plaintiffs' payment of the balance of the purchase price. Plaintiffs did not pay the balance due by the due date and, therefore, were in default. As Defendant properly exercised its right to declare a default and the evidence shows that Plaintiffs did not cure the default within the ten day cure period, we reverse the Trial Court's June 17 order and dismiss Plaintiffs' claims against Defendant. The dismissal of the Plaintiffs' claim against Pamela Mabee was not challenged on appeal, and it remains in place.

We recognize that our decision results in a harsh outcome for Plaintiffs who had made payments totaling approximately one-half of the purchase price of Lot 37, payments that under the Contract they now forfeit. However, it is not the role of this Court "to make a different contract than that executed by the parties." *Posner v. Posner*, No. 02A01-9710-CV-00249, 1997 Tenn. App. LEXIS 930, at *6 (Tenn. Ct. App. Dec. 30, 1997), *no appl. perm. appeal filed. See also, e.g., Central Drug Store v. Adams*, 201 S.W.2d 682 (Tenn. 1947). "In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought to be harsh or unjust." *Tenpenny v. Tenpenny*, No. 01-A-01-9406-CV-00296, 1995 Tenn. App. LEXIS 105, at *15 (Tenn. Ct. App. Feb. 22, 1995), *appl. perm. appeal denied July 3, 1995*. While this may not be the result this Court would prefer, it is the result mandated by the law and the evidence.

## **Conclusion**

The judgment of the Trial Court is reversed, Plaintiffs' claims against Defendant are dismissed, and the case is remanded to the Trial Court for reassessment of and collection of the costs below. The costs on appeal are assessed against the Appellees, Rabia Kafozi and Audry C. Kafozi.

 

_____
D. MICHAEL SWINEY, JUDGE