IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 28, 2006 Session

## DU SIK LEE AND WON JAE LEE
v.
## KENNETH R. DAVIS AND LINDA P. DAVIS

An Appeal from the Circuit Court for Shelby County
Nos. CT-003329-04; CT-003454-04     Karen R. Williams, Judge

_____

No. W2006-01018-COA-R3-CV - Filed July 3, 2007

_____

This is a breach of contract case. The defendants own a commercial building that was seriously damaged by a fire. The plaintiffs entered into a lease-purchase contract with the defendants to acquire the building at the expiration of a ten-year lease. Under the contract, the plaintiffs agreed to renovate the building from the fire damage, consistent with the local city building code and the defendant owners' approval. After some renovations were made, prior to the expiration of the contractual repair period, the defendants deemed the renovations to be not in compliance with the city code and disapproved them. The defendant owners then declared the plaintiffs to be in breach of the contract and repossessed the property. The plaintiff lease-purchasers sued the defendant owners for breach of contract, claiming that, at the time of repossession, the renovations were not yet completed and that they still had time under the contract to complete them. After a bench trial, the trial court determined that the plaintiffs had breached the contract because the renovations were not in compliance with the city code and did not meet the approval of the defendant owners. The plaintiffs now appeal. We affirm, concluding that the evidence does not preponderate against the trial court's finding that the plaintiffs breached the contract by making repairs that were not in compliance with the applicable code; the fact that the contractual repair period had not yet expired is immaterial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., joined, W. FRANK CRAWFORD, P.J., W.S., did not participate.

Nicholas J. Owens, Jr., Memphis, Tennessee, for the appellants, Du Sik Lee and Won Jae Lee.

James W. Hodges, Jr., and Regina Morrison Newman, Memphis, Tennessee, for the appellees, Kenneth R. Davis and Linda P. Davis.

**OPINION**

Defendant/Appellees Kenneth R. Davis and his wife, Linda P. Davis (collectively, "the Davises"), own a commercial building which included three street addresses — 3675, 3681, and 3683 Jackson Avenue in Memphis, Tennessee. Beginning in 1994, Plaintiff/Appellants Du Sik Lee and his wife, Won Jae Lee (collectively, "the Lees"), leased 3675 Jackson from the Davises and operated a grocery store at that location. The lease was scheduled to expire in March 2004. The remaining part of the building at 3681 and 3683 Jackson was leased to Roguel Loera and Monica Tobias for the operation of a Mexican restaurant.

On January 12, 2004, two months before the Lees' lease was to expire, a fire broke out in the grocery store. The fire seriously damaged both the grocery store and the Mexican restaurant. After the fire, the Lees sought to purchase the entire building from the Davises. The principals who negotiated the contract were Mrs. Lee and Mr. Davis.[1]

On March 24, 2004, the parties met at the office of the Davises' attorney, James W. Hodges, Jr. ("Hodges"), to execute a Contract for Deed ("the Contract") on the subject property. Prior to execution of the Contract, the Lees paid the Davises a $30,000 cash down payment. Under the Contract, the Lees agreed to lease the property for ten years for approximately $1,337 per month until the closing date of April 1, 2014. The Lees agreed to accept the property in its damaged condition and to renovate it to the satisfaction of the Davises by August 30, 2004. With respect to the renovations, the Contract provided:

> [7.](f) Purchaser shall accept the Property as is and shall complete renovation of said property by August 30, 2004. Should the renovations not be completed Seller shall extend the time for completion to a date certain in writing at which time Seller shall have the option to terminate this Agreement.
> (g) Renovation must be up to MEMPHIS CITY Building Code, the electrical must be 300 U.L. and renovations must meet approval of Seller. Purchaser shall not allow any liens to be placed on the property without Seller's approval.

There were no other specifications on the renovations to be done. The Contract also assigned the Mexican restaurant lease to the Lees, and the Lees were permitted to collect those lease payments of $2,900 per month.

To do the required renovations, Mrs. Lee hired Rong Chu Jin, also called "Mr. Kim," to act as the general contractor, for which he was to be paid $133,350. When Mrs. Lee signed the contract with Mr. Kim, she made an initial payment of $80,000. Although Mr. Kim had a business license, he did not have a contractor's license. He began working on the renovations around the end of March or the beginning of April 2004. The subcontractors hired by Mr. Kim were appropriately licensed and all had obtained permits to perform their work.

---

[1]Mrs. Lee later testified that her husband is an artist and she is the business person in the relationship.

Over the course of the renovations, the parties dispute the extent to which Mr. Davis inspected the ongoing work and communicated his disapproval of it to the Lees. It is undisputed that, on May 4, 2004, attorney Hodges, on behalf of the Davises, wrote a letter to the Lees informing them that they were in breach of the Contract for, among other things, failing to make repairs to the Mexican restaurant in compliance with the Memphis City Code and to the satisfaction and approval of the Davises. Hodges' letter specified that the Lees had failed to put the proper 300 ansel system in the restaurant, failed to get the Davises' approval for the heating, air conditioning, and lighting in the restaurant, failed to properly replace the ceiling fans and treat the smoke damage in the restaurant, and failed to properly repair the roof in a manner that complied with the Memphis City Code. He communicated the Davises' overall disapproval of the repairs and renovations. The letter further asserted that the Lees had failed to obtain insurance as was required under the Contract. The letter then informed the Lees that "the Contract for Deed is now terminated and you must either contact Mr. Davis and negotiate a lease or vacate the premises." At approximately the same time that Hodges' letter was delivered to the Lees, Mr. Davis changed the locks on the premises, thereby preventing Mr. Kim and the subcontractors from continuing to work on the property. Subsequently, Mr. Davis hired others to complete the renovations and to correct the problems he said were caused by Mr. Kim and his subcontractors.

On June 9, 2004, the Lees filed a lawsuit against the Davises. In their lawsuit, the Lees sought a declaratory judgment that they were not in breach of the Contract, that they were entitled to purchase the property pursuant to the terms of the Contract, and that they were entitled to attorney's fees under the Contract. On June 15, 2004, the Davises filed a lawsuit in the same court against the Lees. The Davises' lawsuit asserted that the Lees had breached the Contract and sought the full contract amount of $110,000, plus lost interest, cost of renovations, and attorney's fees. On October 1, 2004, the trial court entered an order consolidating the two cases. On November 12, 2004, the Lees amended their complaint to add a claim for lost profits.[2] Prior to trial, the Davises stated in open court that they planned to seek $50,483.60 in lost profits on the sale of the property and attorney's fees.

On November 7 and 8, 2005, a bench trial was conducted. The trial court heard testimony from the parties, the general contractor Mr. Kim, and a variety of subcontractors and other witnesses. Since both Mrs. Lee and Mr. Kim speak Korean as their primary language, they testified with the aid of an interpreter.

Mrs. Lee testified at the outset of the trial. As background, Mrs. Lee testified that she had received no formal training in English, but nevertheless understood simple English and could greet customers at their grocery store, discuss items and prices, and read and understand invoices. In addition to managing the grocery store in the subject property, Mrs. Lee also managed a local restaurant owned by her and her husband.

---

[2]The amended complaint also included a claim for the return of "several coolers and shelves and other items" that were purchased by the Lees during the renovations. This issue was not raised at trial, however, and it appears that it is no longer being pursued by the Lees.

Mrs. Lee said that she brought her brother with her to Hodges' office to assist in translations for negotiation of the Contract with the Davises. Mrs. Lee's brother read the Contract to her line by line so that she would understand it. At the time she came to Hodges' office to negotiate the Contract, Mrs. Lee had already paid the Davises $30,000 as a down payment. The Contract was for the remaining $110,000 on the purchase price. Mrs. Lee agreed to make repairs to the building, but there was no discussion about the details of the repairs. The parties agreed to a deadline for the repairs of August 30, 2004 at Mrs. Lee's request, because she wanted a generous amount of time to make repairs in case they did not pass inspection initially. Mrs. Lee asserted that she had obtained proper insurance, as required in the Contract, and she submitted documentary proof of such insurance. She understood that the Contract permitted her to purchase the property in advance of the closing date in April 2014 if she paid a prepayment penalty of $11,000.

Mrs. Lee said that Mr. Kim told her that he had a business license, and she thought that this was sufficient under the Contract. She visited the property three or four times while Mr. Kim was there working. He told her that Mr. Davis had visited the premises three or four times to look at the renovations, but did not tell her that Mr. Davis had ever indicated that he had a problem with Mr. Kim's work.

Mrs. Lee claimed that the first time she became aware that there were problems with the renovations being performed by Mr. Kim and his subcontractors was when she received Hodges' May 4, 2004 letter. On approximately May 10 or 11, Mr. Davis changed the locks on the premises, and thereafter she was given no opportunity to fix the problems. Mrs. Lee later conceded that she was shown a notice dated March 11, 2004, indicating that the renovations to the Mexican restaurant were improper; when her son read it to her, she said, she only understood about 50% or 60% of it.

At the time she received the May 4, 2004 default letter, Mrs. Lee said, the renovations were not complete. Mrs. Lee stated that she had given the Mexican restaurant operator, Roguel Loera ("Mr. Loera"), and Mr. Kim money for a variety of repairs to the restaurant, including cleaning the vent-a-hood, new tiles and paint to eradicate the smoke smell, repairs to the air conditioner, electrical repairs, and repairs to the lighting and the ceiling. At the time Mr. Davis repossessed the property, she said, the air conditioning in the restaurant had been repaired and had passed inspection, but the electrical inspection and health inspection were still needed, the ceiling needed to be rehung, and a fire wall had to be established after the electrical inspection was finished.

Regarding the grocery store, Mrs. Lee stated that the work on the floor and the walls, the door in front, the window, the walk-in cooler, the fire wall between the grocery store and the restaurant, the cash register cabinet, and the shelves were all completed. The electrical work was not complete, and she was not certain about whether the restroom and the roof were complete. She did not discuss the beams supporting the roof with Mr. Kim, but she trusted him to repair the roof correctly. She had not yet asked for Mr. Davis's approval on the job because the renovations were not complete.

Mrs. Lee testified that she had planned to reopen the grocery store in July 2004 but was unable to do so because of the Davises' repossession of the property. She claimed lost profits and lost lease payments from the Mexican restaurant as damages.

Counsel for the Lees sought to introduce evidence of the Lees' ability and desire to purchase the property pursuant to the terms of the Contract. This evidence was disallowed, and the Lees made an offer of proof on these issues.

Mr. Kim testified at trial, and his deposition testimony was entered into evidence as well. He confirmed that he has a business license but does not have a contractor's license, and that he told Mrs. Lee he was qualified to be the general contractor for the repairs and renovations. Mr. Kim said that he installed a new ceiling, new walls and flooring, and remodeled a bathroom. He subcontracted the electrical, plumbing, and air conditioning work. He testified that all of his subcontractors had valid licenses for the work they performed, and that they all pulled permits for their respective jobs. He admitted seeing Mr. Davis at the work site several times, but did not recall Mr. Davis or anyone else ever telling him that his work was not satisfactory. Mr. Kim indicated he did not discuss his work on the property with Mr. Davis, because Mrs. Lee was the person who hired him.

Mr. Kim stated that, when he was locked out of the premises, the interior renovations were almost complete, and he had completed the work he was asked to do on the Mexican restaurant. The roofing work was not yet completed, and he and Mrs. Lee were in the process of looking for a roofing subcontractor to replace the roof. At the time the property was repossessed, Mr. Kim said, it would have taken approximately fifteen to twenty more days to complete the renovations.

When Mr. Kim was asked about the work he had done on the grocery store ceiling, he testified that he had put up a wooden ceiling frame, or grid, that he had put wood above the grid and attached it to the ceiling beams, or joists, and that he had painted the wood. He explained that he did this because there was fire and smoke damage to the ceiling, and he was attempting to protect the store from falling soot. He confirmed that he did not reinforce the metal beams before he put up the wood.

The trial court also heard testimony from Mr. Kim's subcontractors. The electrician testified that, at the time they were locked out, he had completed 60% to 75% of his work at the grocery store and had completed all of the work at the Mexican restaurant. He acknowledged that he was concerned that some of the light fixtures should have been replaced, but said that Mr. Kim asked him to replace only the lenses and not anything else. The electrician confirmed that, if the roof were replaced, he would have had to remove some of his electrical work and reinstall it. He also commented that the beams in the ceiling in the grocery store were disfigured, but he did not know why.

The subcontractor who installed the new air conditioning unit on the roof of the building testified that the Davises' repossession of the property prevented him from completing the installment of the unit. By that time, he said, he had replaced the duct work and had put smoke

detectors in the air conditioning system, and was preparing for inspection by code enforcement before he could complete the job. The plumber testified by deposition that he worked on the grocery store, but not the Mexican restaurant. The plumber tore out existing plumbing and completed two bathrooms; he also installed water heaters and set up a three-compartment sink. At the time he was locked out, he had completed all of the plumbing tasks except running a condensate (air condition drain) and a water line and hooking up the sink.

Mr. Davis testified on his own behalf. Shortly after the fire, he said, Mrs. Lee approached him about buying the building, and the parties entered into the Contract described above. Immediately after that, Mr. Kim began working on the renovations of the grocery store. Mr. Davis said that he complained to Mr. Kim that he was working only on the grocery store and that he should have been working more on the Mexican restaurant. He said he also complained to Mr. Kim that his workers were putting an air conditioner on the roof before the roof had been repaired. When he attempted to discuss the matter with Mr. Kim, he said, Mr. Kim "just walked off and wouldn't talk to me," and told Mr. Davis that he worked for the Lees, not Mr. Davis. Consequently, Mr. Davis went to Hodges' office and drafted a notice to Mrs. Lee informing her that Mr. Kim was not repairing the Mexican restaurant properly. Mr. Davis said that he hand-delivered this notice to Mrs. Lee on April 11, 2004, but the notice was erroneously dated March 11, 2004. The notice stated that the Lees' failure to properly renovate the property had interfered with the business at the Mexican restaurant:

> This will hereby serve notice to Du Sik Lee and Won Jae Lee that your failure to properly proceed with the repairs to 3681 Jackson Avenue and 3683 Jackson Avenue is interfering with the business relationship of Kenneth R. Davis, Linda P. Davis and Monica Tobias and the on-going business of the Seven Seas Mexican Restaurant. Should this not be cured immediately, you will be deemed to have [] breached the buy-sale agreement previously entered into between the parties.

Mr. Davis testified that Mrs. Lee's younger son was present when he delivered the notice, and that Mrs. Lee read it, signed it, and indicated that she fully understood its contents. Despite this, Mr. Davis testified, after he delivered the notice to Mrs. Lee, Mr. Kim continued to put more work into the grocery store than the Mexican restaurant.

Mr. Davis stated that he called Mrs. Lee on approximately May 1 or 2, 2004, and asked her if she had obtained insurance in accordance with the Contract. He said that she responded that she had not and did not plan to purchase insurance until the store opened. Mr. Davis said that he complained to Mrs. Lee that Mr. Kim had put up the ceiling grid in the grocery store and had done the air conditioning duct work prior to repairing the roof, and that she did not respond to this complaint. When asked why he sent the May 4, 2004 foreclosure letter to the Lees, Mr. Davis responded that the Lees were "not properly repairing the roof on the [grocery store], [Mrs. Lee] had no insurance, her first payment was late, and as far as the investment I had with no insurance, I couldn't take the chance." He explained that he was particularly concerned about the unsafe condition of the roof, because without repairing the beams it could have collapsed.

Mr. Davis testified that Mr. Loera had told him that Mrs. Lee said that she was finished with repairs to the Mexican restaurant. This concerned Mr. Davis, because the restaurant was in bad condition and not ready to open. He said the restaurant was "[f]ilthy, nasty, . . . [t]he air handlers would not work, the air conditioners would not work, [and] new duct work was put on old units." After he took over, he said, he replaced the three-part sink, the gas stove, the two-door refrigerator, ceiling tiles, and the lighting because they had been damaged by the fire and smoke. (At 286-88). To further treat the smoke damage, he hired someone to clean the restaurant, including the tables, chairs, and flooring. In all, Mr. Davis said, he spent about $73,000 getting both the grocery store and the Mexican restaurant in rentable condition. Beginning in July 2004, the Davises again began collecting the $2,900 lease payments from the Mexican restaurant lease. In September 2004, the Davises rented the grocery store property to another tenant for $1,800 per month.

Mr. Loera testified that Mrs. Lee hired him to paint the restaurant and clean the kitchen and equipment. Mr. Loera said that Mrs. Lee or her workers installed lights and put up a fire wall. Mr. Loera said that Mrs. Lee told him that she had completed her work and that the restaurant could open. He did not feel, however, that it was appropriate to open the restaurant at that time because other things needed to be done and he did not think it would have passed a health inspection. After Mr. Davis repossessed the property, they got the restaurant ready to open by replacing the sink in the kitchen, replacing the refrigerator, and painting the kitchen. Mr. Loera replaced the kitchen floor with the tiles purchased for him by Mrs. Lee.

In June 2004, Mr. Davis hired Michael Pinckard ("Pinckard"), who owns a residential and commercial repair business, to assess the condition of the building. Pinckard testified at trial. He said that the type of glass installed in the front of the grocery store by Mr. Kim did not meet commercial standards, and that the way it was installed made it difficult to replace the glass in the event that it was broken or damaged. In addition, because Mr. Kim did not use caulking in the installation, the glass was not watertight or airtight. Pinckard further testified that the front entry door installed by Mr. Kim was intended for residential use and did not even have a dead bolt, and therefore it would not meet the standard in the industry for a commercial entry door.

Mr. Davis hired James David Donahoe ("Donahoe") to perform heating and air repairs after he repossessed the property, and he testified as well. When he arrived at the property in June 2004, Donahoe discovered that the heating unit had been badly damaged by the fire. Donahoe replaced the heating unit. He also replaced the air handlers which, had they been used, would have caused a bad odor from the smoke damage. So that the property would pass city code inspection, Donahoe ran a new gas line from the gas meter to the inside of the building. In addition, Donahoe cleaned a condenser unit on the roof of the building and cleaned the vent-a-hood in the Mexican restaurant. He installed the brand new air conditioning unit placed on the roof by Mr. Kim's workers, even though he believed the unit was too small for the building. Finally, Donahoe removed the ceiling grids and light fixtures attached to the ceiling so that repairs could be made to the ceiling.

Larry Snyder ("Snyder") was hired by Mr. Davis to do plumbing work on the grocery store. Snyder testified that he called the plumbing inspector to the property to assess what needed to be

done in order to pass inspection. As a result of this inspection, Snyder determined that he had to correct the piping for the drain to the two-compartment sink, run an air conditioner drain on the roof, install drain covers on various drains in the floor, cap off floor drains that were not in use, extend a valve on the water heater to the floor, and complete the drain to the walk-in cooler. Snyder said that some of the plumbing work had been completed, but it was not up to code.

Norman Timms ("Timms") was retained by Mr. Davis to make repairs to the roof of the building. He determined that the metal trusses, or beams, were bowed from the fire and needed to be resupported. In order to weld supports to the trusses, he had to remove the ceiling grid, heat ducts, lighting, and everything else connected so that scaffolding could be set up to complete the welding.

Mr. Davis also proffered expert testimony by Mark Mazzone ("Mazzone"), an engineer, regarding the condition of the ceiling and the roof. Mazzone visited the property in May 2004, and saw the wood attached to the ceiling by Mr. Kim. He stated that the attached wood actually weakened the roof because it added weight to the roof without adding support, thereby creating a more dangerous condition. He said that the repairs that had been done when he saw the property appeared to be final and almost complete. In order to repair the roof properly, Mazzone stated, the steel beams needed to be reinforced, and, if possible, straightened to take out the sag. Once that was done, the wooden roof deck that rested on the joists could be replaced. In order to replace the wooden roof deck, all of the wood, electrical work, and other items had to be removed. Mazzone's testimony concluded the evidence at trial.

The trial court took the matter under advisement and issued a letter ruling on January 13, 2006. In its ruling, the trial court found that the Lees had breached the Contract by "hiring an unlicensed general contractor who failed to renovate the Property to comply with the Memphis City Building Code." The trial court determined that the repairs to the roof were done improperly, and that the damage was concealed so that a visual inspection would not have disclosed the danger. The trial court found that, at the time the Davises repossessed the property, the Mexican restaurant would not have passed a health department inspection. Additionally, the trial court determined that the Lees had been given notice to cure the alleged default, even though the contract did not require that such notice be given. The court concluded specifically that the written notice dated March 11, 2004, was delivered to Mrs. Lee on April 11, 2004, and that this constituted "notice of the failure to perform and . . . demand for a cure." The trial court found that the Lees were not in breach of the contract by their failure to make a timely lease payment or for their failure to procure the necessary insurance. The trial court concluded that, based on the Lees' breach, the Davises were entitled to damages consisting of "all payments which were made pursuant to the contract including but not limited to the $30,000 down payment, in lieu of other monetary damages." In the letter ruling, the trial court also determined that the Davises were entitled to attorney's fees and set a hearing on that issue.

On April 5, 2006, the trial court conducted a hearing on the matter of attorney's fees. Counsel for both parties testified at the hearing. Attorney Hodges, counsel for the Davises,

submitted an affidavit and fee bills attesting that he spent 127.5 hours on the case at a rate of $200 per hour, for a total attorney's fee of $25,500. At the hearing, however, Hodges said that his contract with the Davises was for a rate of $250 per hour, and he sought an attorney's fee award of $31,875 ($250 x 127.5 hours). Nicholas J. Owens ("Owens"), counsel for the Lees, asserted that some of the time spent by Hodges was unreasonable and that his fee should be reduced appropriately. At the conclusion of the hearing, the trial court credited Hodges' testimony and awarded the Davises $31,875 in attorney's fees. On April 7, 2006, the trial court entered an order restating its findings regarding the Lees' breach of contract and awarding the Davises $31,875 in attorney's fees. From this order, the Lees now appeal.

On appeal, the Lees argue that the trial court erred in determining that they breached the Contract when the Contract allowed them until August 30, 2004 to complete the renovations. They argue further that the trial court erred in finding them in breach when the Contract permitted them to purchase the property from the Davises outright prior to the expiration of the Contract. The Lees also contend that the trial court erred in determining that they breached the Contract by hiring an unlicensed general contractor who failed to comply with the City Code, and in finding they had received notice and an opportunity to cure any breach. Finally, the Lees maintain that the trial court erred in determining that the Davises' attorney's fees were reasonable and necessary.

Because this case was tried by the trial court without a jury, the trial court's findings of fact are reviewed *de novo*, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005). Whether a party has breached a contract is a question of fact, to be reviewed under this standard. *See McInturff v. Neeseman*, 986 S.W.2d 11, 12 (Tenn. Ct. App. 1998); *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. *Kafozi*, 184 S.W.3d at 698. The interpretation of contractual provisions is a question of law, which we review *de novo*, with no presumption of correctness in the trial court's interpretation. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006); *Gates v. State Auto Mut. Ins. Co.*, 196 S.W.3d 761, 764 (Tenn. Ct. App. 2005). The cardinal rule in the construction of contracts is to ascertain the intent of the parties. *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310, 313 (Tenn. Ct. App. 1984). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983). If the language of a written instrument is unambiguous, a court must interpret it as it is written, rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981).

We first address the Lees' argument that the trial court erred in holding that they had breached the Contract as of the date of the May 4, 2004 letter declaring them in default, even though the Contract expressly provided that they would have until August 30, 2004 to complete the required renovations. They point out that the August 30, 2004 deadline to complete the renovations was added at the Lees' request, because Mrs. Lee knew that the renovations would take time and wanted to make sure that she had ample time to complete them. Thus, they assert, even if they had done no

repairs by May 4, 2004, they still would not have been in breach because they had plenty of time to complete the renovations under the Contract.

The Contract states that the Lees "shall complete renovation of said property by August 30, 2004," and that this deadline shall be extended if the renovations are not completed by that time. *See* Contract at ¶7(f). The trial court's finding of breach, however, did not relate to timeliness; the Davises did not contend at trial that they retook possession because the renovations would not have been completed by the Contract deadline. Rather, the evidence showed that the repairs done by the Lees were not done properly, *i.e.* consistent with the City Code and to the satisfaction of the Davises. The evidence proffered by the Davises, and obviously credited by the trial court, showed, for example, that the Lees failed to repair the metal beams, leaving the roof in a dangerous condition. They then proceeded to make other repairs which would have to be undone in order to make the roof and ceiling safe; these repairs in fact concealed the dangerous condition of the roof from visual inspection. The longer the repairs by the Lees continued, the more that would have to be undone in order to make the repairs proper and in accordance with the City Code. The trial court found that the Lees were in breach based on the renovations they had done, and the evidence supports this finding.

The Lees argue that, had they been notified of the problems with their repairs, they could have rectified any problems prior to the August 30, 2004 date, and that they should have been given this opportunity based on the deadline provided in the Contract. The Contract, however, does not require that such notice be given. It provides only that, if the Lees default in their contractual obligations, the Davises "may immediately and without notice or demand, re-enter the premises and peaceably repossess the same . . . ." *See* Contract at ¶8. Therefore, under the Contract, they can clearly be deemed in breach for repairs done improperly, and the Davises had no obligation to give them the opportunity to correct the improper renovation.

The Lees claim that, although the Contract does not expressly include a notice requirement, such a requirement should have been implied as a matter of common equity and fairness. They maintain that the preponderance of the evidence did not support the trial court's finding that they were given notice and an opportunity to cure any breach of the contract before being declared in default. They note that Mrs. Lee and Mr. Kim both testified that Mr. Davis never informed them that he had problems with their renovations, and that the March 11, 2004 written "notice" does not speak to the quality of the renovations and refers to a buy-sale agreement, not the Contract executed by the parties.

The trial court found specifically that the notice dated March 11, 2004 was actually delivered by Mr. Davis to Mrs. Lee on April 11, 2004, and that this constituted notice of the Lees' failure to perform and a demand for cure. The trial court also found that Mr. Davis attempted to talk with Mr. Kim about his concerns regarding the renovations, but that "Mr. Kim would not listen and during the second attempt [to talk with Mr. Kim] Mr. Kim walked away from" Mr. Davis. The evidence on these issues was disputed, and the trial court clearly credited the testimony proffered by the Davises. We will not disturb a trial court's credibility determinations absent clear evidence to the

contrary, and we find no such evidence in this case. ***Holladay v. Speed***, 208 S.W.3d 408, 413 (Tenn. Ct. App. 2005). Therefore, even if an obligation to provide notice of the breach and an opportunity to cure were implied under the Contract, we conclude that the evidence does not preponderate against the trial court's finding that such notice was given by the Davises to the Lees and was evidently ignored. Therefore, this issue is without merit.

The Lees next argue that the trial court erred in failing to enforce the contractual provision that would have permitted the Lees to purchase the property outright. Paragraph two (2) of the Contract provides that, "[s]hould Buyer wish to prepay the full purchase price or any full balance prior to April 1, 2014, then there shall be an $11,000 prepayment penalty." ***See*** Contract at ¶2. The Lees sought to submit proof of Mrs. Lee's ability and desire to purchase the property, but this evidence was disallowed. The Lees made an offer of proof on those issues. The trial court made no determination regarding whether the Lees had the right to purchase the property outright under the Contract.

There was no evidence at trial, by offer of proof or otherwise, that the Lees made a tender or took any action to purchase the property prior to the time that the Davises declared them to be in breach and repossessed the property, or in fact at any time prior to trial. Once the Lees breached the Contract, they were no longer entitled to enforce its other provisions, such as the opportunity to purchase the property outright. Therefore, under the circumstances, we reject the Lees' contention that the trial court should have enforced their contractual right to purchase the property.

The Lees also contend that the trial court erred in determining that they had breached the contract by hiring an unlicensed general contractor who failed to make renovations in compliance with the City Code. They point out that the Contract does not require them to hire a licensed contractor to complete the work. They also argue that, if the renovations did not meet City Code, this was so only because Mr. Davis prevented Mr. Kim and his subcontractors from completing their work. The Lees note that all of the subcontractors hired by Mr. Kim were properly licensed and had obtained the necessary permits for their work. If, after inspection, the renovations were found not in compliance with the City Code, then they could have had an opportunity to remedy any shortfalls. The Lees also argue that the trial court should have taken into consideration the Davises' bad faith in declaring them in breach so soon after the Contract was signed. Specifically, after the Davises repossessed the property, they kept the $30,000 down payment, resumed their collection of the lease payments from the Mexican restaurant, and obtained rent of $500 more per month from the new tenant for the grocery store property. Thus, they argue, the Davises' bad faith is evidenced by their pecuniary gain from declaring the Lees to be in breach.

The trial court held that the Lees were in breach of the contract for a number of reasons, including (1) they hired an unlicensed general contractor who failed to renovate the building in compliance with City Code; (2) the repairs the Lees made to the roof had been done improperly and the unsafe condition of the roof was concealed so that the danger could not be seen by a simple visual inspection; and (3) the repairs to the Mexican restaurant ostensibly had been completed, but the restaurant was not clean enough to pass a health department inspection at the time the Davises

-11-

retook the property. To uphold the trial court's decision, we need only determine that one of these bases for the finding of breach is support by a preponderance of the evidence at trial.

After a careful review of the record, we find that the preponderance of the evidence fully supports the trial court's conclusion that the renovations completed by the Lees were not done properly and did not meet City Code standards, as was required under the Contract. Mrs. Lee and Mr. Kim both testified that renovations to the Mexican restaurant were complete. However, testimony and corroborating photographs showed clearly that the restaurant was not ready to open and would not have passed a health inspection when Mr. Davis repossessed the property. The evidence showed that, at the time of repossession, the refrigerator needed to be replaced, the vent-a-hood was rusted and needed to be cleaned, and light fixtures needed to be replaced. Most compelling was the evidence regarding the inappropriate repairs of the roof and the resulting dangerous condition. Mr. Kim testified that he had connected the ceiling grid and wooden panels to the ceiling despite the fact that the leak in the roof had not yet been mended. Mrs. Lee and Mr. Kim both testified that, at the time the property was repossessed, they were looking for a roofer to refelt and retar the roof. At no point did the evidence proffered by the Lees indicate that they had any intention of repairing the metal beams or otherwise insuring that the roof of the building was safe. The evidence proffered by the Davises showed that the repairs made by Mr. Kim exacerbated the weak condition of the roof and concealed its weakness from view. The Davises' witnesses testified that, in order to repair the roof properly, the ceiling grid, heat ducts, lighting and other items connected to the ceiling by the Lees would first need to be removed. Thus, the renovations done by the Lees left the building unclean, unsafe, and not in compliance with the City Code. This evidence, therefore, supports the trial court's conclusion that the Lees had breached the Contract by virtue of the renovations that had been done at the time the Davises repossessed the property.

The Lees also challenge the trial court's finding that the amount of the Davises' attorney's fees were reasonable and necessary. The Contract provides that, if either party is in breach of the Contract, "the party in breach . . . shall pay all costs of enforcements and litigation together with a reasonable attorney's fee." Contract at ¶7(k). In its final order, the trial court awarded the Davises the $31,875 claimed as attorney's fees, indicating its conclusion that such fees were reasonable. An appellate court will ordinarily defer to a trial court's award of attorney's fees unless an abuse of discretion can be shown. *See Threadgill v. Threadgill*, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987). In evaluating the trial court's exercise of its discretion, we review the attorney's fee award *de novo* on the record, presuming the trial court's finding to be correct unless the evidence preponderates otherwise. *See Hamilton v. T & W of Knoxville, Inc.*, No. E2003-02004-COA-R3-CV, 2004 WL 948384, at *4 (Tenn. Ct. App. May 4, 2004).

Once again, this issue turns on the trial court's determinations regarding the credibility of the witnesses, which will not be overturned absent clear evidence to the contrary. The trial court in this case observed the witnesses, considered all the evidence, and determined that Hodges' requested fee was reasonable. With appropriate deference to the trial court's credibility determinations, the evidence does not preponderate against its finding, and the award of attorney's fees is affirmed.

The decision of the trial court is affirmed.  Costs on appeal are to be assessed to Appellants Du Sik Lee and Won Jae Lee, and their surety, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE