# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 22, 2012 Session

## PEGGY GIFFIN d/b/a RE/MAX REALTY CENTER, ET AL. v. ANTHONY SAWYER, ET AL.

**Appeal from the Circuit Court for Roane County**
No. 14508      J. Michael Sharp, Judge Sitting By Interchange

---

**No. E2011-01240-COA-R3-CV-FILED-JULY 3, 2012**

---

Peggy Giffin d/b/a Re/Max Realty Center[1] and Racia Futrell (collectively "Plaintiffs") sued Anthony Sawyer and Hope Sawyer[2] alleging, among other things, that the Sawyers had breached a real estate sales agency contract. After a bench trial, the Trial Court entered its order finding and holding, *inter alia*, that the Sawyers did not breach the sales agency contract and that Plaintiffs were not entitled to collect a commission under the sales agency contract. Plaintiffs appeal to this Court. We find that the evidence does not preponderate against the Trial Court's findings, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Jonathan Swann Taylor, Knoxville, Tennessee, for the appellants, Peggy Giffin d/b/a Re/Max Realty Center, and Racia Futrell.

---

[1] This suit originally was styled FGS, Inc. d/b/a Re/Max Realty Center and Racia Futrell v. Anthony and Hope Sawyer. During the pendency of the suit, the Trial Court entered an Agreed Order substituting Peggy Giffin d/b/a/ Re/Max Realty Center as a plaintiff and the real party in interest in the place of FGS, Inc. d/b/a Re/Max Realty Center.

[2] Mrs. Sawyer is not a party to either of the deeds by which Mr. Sawyer took title to the Properties. Furthermore, although she signed the first sales agency contract, Mrs. Sawyer did not sign the sales agency contract at issue in this suit. At trial, Mrs. Sawyer moved to be dismissed as a defendant. The Trial Court granted this motion.

Mark N. Foster, Rockwood, Tennessee, for the appellees, Anthony Sawyer and Hope Sawyer.

## OPINION

### Background

Mr. Sawyer entered into three sales agency contracts with Re/Max Realty Center ("Re/Max") concerning real property he owned at 500 Emory River Road and 510 Emory River Road in Harriman, Tennessee ("the Properties"). The first sales agency contract was for 500 Emory River Road and was effective from January 26, 2008 through July 26, 2008. The first sales agency contract was extended through January 14, 2009. The second sales agency contract was for 510 Emory River Road and was effective from July 14, 2008 through January 14, 2009. The third sales agency contract was for both 500 and 510 Emory River Road and was effective from September 2, 2008 through March 2, 2009. The third sales agency contract is the one at issue in this suit. As such, we need not discuss the first two sales agency contracts.

The third sales agency contract ("the Contract") provides, in pertinent part:

1. RIGHT TO SELL
I hereby grant to Real Estate Sales Agency (Agent) the sole, exclusive and irrevocable right to sell the property and on the terms referred to on the reverse side hereof, or at such lesser price or terms to which I may consent. Agent is hereby authorized to hold in escrow in a trust account any earnest money received in connection with any sales agreement, to be disbursed pursuant to said agreement.…

2. COMPENSATION TO AGENT
I hereby agree to compensate Agent, if during the term hereof or any extension thereof, the property is sold by agent or any other person, or, if a sales agreement is obtained for the property by Agent or any other person with a buyer who is willing and able to purchase the property upon the price and terms herein set forth or any other price and terms I may accept or, if the property is withdrawn from sale, transferred, conveyed, leased without the consent of Agent or made unmarketable by my voluntary act. If suit is brought to collect the compensation or if Agent successfully defends any action brought against Agent by me relating to this authorization or under any sales agreement relating to the property, I agree to pay all costs incurred by Agent in connection with such action including a reasonable attorney's fee. The term

"sale" shall be deemed to include any exchange or trade to which I consent and, in such event, Agent is permitted to represent and receive compensation from both parties with full disclosure.

\* \* \*

5. CARRY OVER PERIOD
If the property is sold or otherwise transferred within the specified period of carry-over days after the expiration of this agreement to any person or entity with whom Agent has negotiated, shown the property, or to whom Agent has introduced me, during the term hereof, then the aforesaid compensation shall be payable to Agent provided, however, that Agent notified me in writing of such negotiation, showing or introduction within ten (10) days after the termination hereof, and provided further, that said compensation shall not apply if the property is listed with another licensed real estate Agent during said carry-over period. Upon expiration of this contract, the Multiple Listing Service is authorized to notify its Participants of the expiration.

On December 22, 2008, the Kingston TVA fossil plant had an ash spill into the Emory River that affected numerous properties fronting on Emory River. The ash spill damaged Mr. Sawyer's dock and a boat located on the Properties. After the ash spill, TVA officials and representatives began contacting property owners in the area including Mr. Sawyer and made offers to purchase some of the affected properties. On March 17, 2009 TVA made a written offer to purchase the Properties. Mr. Sawyer accepted the offer and the closing occurred on March 18, 2009. Initially, TVA withheld $33,000 representing a six percent commission, but later it gave notice to Re/Max and released this money to Mr. Sawyer.

Plaintiffs sued the Sawyers alleging, in part: 1) that the Sawyers had entered into a sales agency contract giving Plaintiffs the sole, exclusive, and irrevocable right to sell real property located at 500 Emory River Road, and 510 Emory River Road in Harriman, Tennessee for a period commencing September 2, 2008 and expiring March 2, 2009; 2) that during the exclusive listing period the Sawyers executed a contract to sell these real properties to the Tennessee Valley Authority ("TVA"); and, 3) that the Sawyers had conspired to prevent Plaintiffs from participating in the negotiation process with TVA in an attempt to avoid paying Plaintiffs a commission. The Sawyers answered the Complaint and

filed a counter-claim alleging, among other things, that Plaintiffs were in violation of Tenn. Code Ann. § 47-18-104(a)[3].

The case proceeded to trial without a jury. Mr. Sawyer testified at trial that he had wanted to sell the Properties because he had obtained a new job in Erwin, Tennessee, which he started in early 2008. He testified that TVA officials came to his house after the ash spill to offer help, and he asked TVA if they would purchase his property. Mr. Sawyer testified that TVA told him if his property were determined to be in an affected area, TVA would make an offer to purchase. Mr. Sawyer was asked what the TVA officials said during the first meeting, and he stated:

> I think they came through and asked if we were okay, if we needed anything. They were - - I think the very first people that came through were contractors for TVA, and then TVA ended up bringing their own people in.
>
> They asked if we needed anything, if anything was damaged. They offered to put up - - they put up a fence in our yard eventually, but they offered to do that to keep the animals out of the river. They asked if we needed air filters for our ventilation systems, which they provided to a lot of the neighbors. Just general stuff like that.

Mr. Sawyer attended a public meeting where TVA officials advised that they intended to purchase homes that had been affected by the ash spill.

In January of 2009, Mr. Sawyer provided TVA with some documents including a recent appraisal of one of the Properties, drawings of his docks, and a map of the area showing the location of his homes. He stated that the ash spill had damaged his dock and boat and that he was seeking compensation for those losses. He also asked TVA if TVA would purchase the Properties. Mr. Sawyer sent TVA a copy of the Contract. When asked, Mr. Sawyer stated that he thought he sent the Contract to TVA in January when he sent the other information regarding the Properties.

Prior to March 2, 2009, TVA sent appraisers to appraise Mr. Sawyer's homes. On March 17, 2009 TVA made an offer to purchase the Properties for $550,000. Mr. Sawyer entered into a contract to sell the Properties to TVA on March 18, 2009, and executed the deed for the Properties that same day. TVA withheld $33,000 from the purchase price as the commission.

---

[3]At the close of trial, Plaintiffs moved for a directed verdict on the Sawyers' counter claim and the Trial Court granted the motion dismissing the counter claim.

Mr. Sawyer testified that, prior to March 17, 2009, TVA did not tell him specifically that they intended to purchase his property. TVA never told Mr. Sawyer they would buy his properties until TVA made the written offer. He stated: "they said that they were going to buy homes in the area that were affected." Mr. Sawyer considered his home affected, but TVA did not tell him before making the written offer to purchase the Properties that TVA considered his homes affected.

When asked if he had done anything to get TVA to delay making an offer on the Properties, Mr. Sawyer replied: "No, I did not." Mr. Sawyer did not know when TVA initially authorized the purchase of the Properties. He stated: "I don't know when they internally made the decision. I mean, I was not part of their decision making."

Racia Futrell was the real estate agent with Re/Max who was working to sell the Properties. Ms. Futrell testified that she has been a real estate agent with Re/Max for twelve years. The broker at Re/Max is Peggy Giffin. Ms. Futrell explained that the Contract provided for an exclusive listing agreement on the Properties.

After the ash spill, Ms. Futrell attended a meeting with TVA and other real estate agents and brokers and was assured that although TVA would not discuss details with anyone but property owners, that any real estate agent involved in a transaction would be paid a full commission. She stated: "During the meeting, yes, they had assured us that anything that was listed we would be paid a full commission. And TVA was not paying the commissions. They were to come from the owners of the property, because there was a legal sales contract." She admitted that TVA told the realtors that TVA was going to deal with the homeowners directly. She stated:

> We could have contact with TVA as far as between ourselves as Realtors and TVA regarding our situation, what part we were involved in. We were not suppose [sic] to have contact with TVA about anything as far as what the offer was or what their - - whatever they called it. Their personal loss, any of those issues, we were not allowed to be involved in that.

Ms. Futrell was asked if she introduced TVA to Mr. Sawyer and she stated: "[Mr. Sawyer] had already talked to TVA before I was made aware of it. There wasn't a whole lot I could do at that point. I can't introduce them to a property when he's already made contact with them." Ms. Futrell admitted that she did not introduce Mr. Sawyer to TVA, did not show the Properties to TVA, and did not negotiate with TVA for the sale of the Properties. She also admitted that she never sent a notice to Mr. Sawyer under the carry over provision of the Contract. Ms. Futrell did send a copy of the Contract to TVA.

Ms. Futrell testified that she contacted Mr. Sawyer after the ash spill about wanting to show the Properties to some prospective buyers but that he would not allow her to do so. She stated that this happened twice. She admitted, however, that Mr. Sawyer allowed her to show the Properties on February 6, 2009 .

Mr. Sawyer was asked about refusing to allow Ms. Futrell to show the Properties, and he stated:

> One time Racia told me that there was a person wanting to look at the property who was admittedly not going to buy the property, but wanted to see what his money would buy in the area. And it was inconvenient for us to show at that moment, so we agreed that we - - we didn't feel that we needed to show it to him or her at that point.

Ms. Futrell also testified that Mr. Sawyer asked her to take down the real estate listing signs prior to the expiration of the Contract, but she did not take down the signs. When asked about the allegation that he had asked Ms. Futrell to take down the signs, Mr. Sawyer stated:

> I sent that e-mail after the two first contracts expired. I did not remember that we had the third contract. I apparently misplaced it, so I figured we were done listing it with them. "Come and get your signs. You can have them." But they reminded me that we've got a third contract, so signs were never pulled.

Mr. Sawyer testified that he never took the signs down.

After the trial, the Trial Court entered its Final Order on May 16, 2011 finding and holding, *inter alia*:

> This court finds that the plaintiffs in this case never negotiated with TVA, nor did the plaintiffs in this case introduce the defendants to TVA, nor TVA to the defendants. There was never any notice by the plaintiffs to the defendants of any such introduction, because no such introduction occurred. The plaintiffs in this case never engaged in any negotiation, nor negotiation activities, showing or showing activities, nor any form of introduction with TVA. The reasons for TVA's interest in this property had nothing to do with anything that the plaintiffs did. Nor were any of the plaintiffs' activities in any way related to TVA's interest, and ultimately, TVA's purchase of the property. The act that occurred was totally and completely outside the parties['] thoughts, and the parties['] intention when the listing agreement was entered

-6-

into. Neither the plaintiffs nor the defendants contemplated an event such as the event that occurred in this case. The court finds that the plain language of the listing agreement requiring compensation to the agent has not been met. Specifically, the agent did not sell the property, nor did any other person in any way involved with or associated with the agent, sell the property. The court finds that TVA refused to negotiate with or through real estate agents, and therefore, no negotiations with the plaintiffs in this matter were ever had.

The court recognizes that the request for approval was sent to the necessary TVA officials during the term of the listing agreement. However, the court finds that the approval by the necessary TVA officials was not obtained until after the listing agreement had expired. The court finds that there was no contract entered into during the term of the listing agreement, and ultimately, the closing did not occur during the term of the agreement. The court finds that the contract that was entered into, and ultimately the closing that did occur, was not the result of any activities caused or created by the plaintiffs.

\* \* \*

The court finds that the defendants did not breach the listing agreement by failing to refer all inquiries regarding the property to the agent. The court has already found that TVA made it clear to all involved that they would not, and did not, deal with anyone other than the specific affected property owners. Furthermore, the court finds that TVA never inquired with, or negotiated with, the plaintiffs in any way regarding the defendants' property. The court finds that Mr. Sawyer's actions of submitting information to TVA was not a breach of the agreement. He was simply acting, as any property owner would have acted under these circumstances by attempting to see what, if anything, TVA planned to do to make the defendants whole after the ash spill had occurred.

The court finds that there is no provision of any kind in the listing agreement stating what each party would do regarding the marketing and sale of this property if a third party damaged the property, such as occurred in this situation. The court finds that both parties agreed, and testified at trial, that neither had contemplated such a situation at the time they entered into the listing agreements.

Plaintiffs appeal to this Court.

**Discussion**

Although not stated exactly as such, Plaintiffs raise one issue on appeal: whether the Trial Court erred in finding that Mr. Sawyer did not breach the terms of the Contract when he failed to refer TVA to Re/Max during the term of the Contract. The Sawyers raise two additional issues if this Court rules in favor of Plaintiffs on their issue, which we restate as: 1) whether the Trial Court erred in failing to find that neither Giffin nor Futrell was a party to the Contract; and, 2) whether the Trial Court erred in failing to dismiss the Complaint for failure to comply with Tenn. R. Civ. P. 10.03.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

As this Court explained in *Kafozi v. Windward Cove*:

In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)(citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id*. (quoting 17 Am. Jur. 2d, *Contracts*, § 245).

\* \* \*

[I]t is not the role of this Court "to make a different contract than that executed by the parties." *Posner v. Posner*, No. 02A01-9710-CV-00249, 1997 WL 796216, at *2, 1997 Tenn. App. LEXIS 930, at *6 (Tenn. Ct. App. Dec. 30, 1997), *no appl. perm. appeal filed*. *See also, e.g., Central Drug Store v. Adams*, 184 Tenn. 541, 201 S.W.2d 682 (1947). "In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought to be harsh or unjust." *Tenpenny v. Tenpenny*, No. 01-A-01-9406-CV-00296, 1995 WL 70571, at *6, 1995 Tenn. App. LEXIS 105, at *15 (Tenn. Ct. App. Feb. 22, 1995), *appl. perm. appeal denied July 3, 1995*.

*Kafozi v. Windward Cove LLC.*, 184 S.W.3d 693, 698, 700 (Tenn. Ct. App. 2005). In addition, as this Court explained in *Elliott v. Elliott*:

Every contract imposes upon the parties a duty of good faith and fair dealing in the performance and interpretation of the contract. *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979); 2 JOSEPH M. PERILLO & HELEN HADJIYAUUAKIS BENDER, CORBIN ON CONTRACTS § 5.27, at 139 (rev. ed. 1995). This duty requires a contracting party to do nothing that will have the effect of impairing or destroying the rights of the other party to receive the benefits of the contract. *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995).

*Elliott v. Elliott*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004).

We first consider whether the Trial Court erred in finding that Mr. Sawyer did not breach the terms of the Contract when he failed to refer TVA to Re/Max during the term of the Contract. The Trial Court found that Mr. Sawyer had not breached the Contract by failing to refer TVA to Re/Max. Specifically, the evidence in the record shows that Ms. Futrell was aware that Mr. Sawyer was having conversations with TVA and also was aware that TVA, by its own choice, would deal only with property owners. The evidence shows that Mr. Sawyer did not hide his discussions with TVA from Ms. Futrell and Re/Max, but rather that he specifically informed them that he was talking to TVA about the possibility of TVA purchasing the Properties.

Plaintiffs also argue that Mr. Sawyer breached the Contract by refusing to show the Properties on two occasions and by requesting that the signs be taken down. These allegations are red herrings. First, Mr. Sawyer provided an explanation for one of the times when he refused to show the Properties, and the record reveals that Mr. Sawyer did allow Ms.

Futrell to show the Properties on other occasions after the ash spill. Second, Mr. Sawyer explained that he asked to have the signs removed because he had forgotten about the third listing and thought that the listings had expired. When he was informed that the listings had not expired, Mr. Sawyer stopped asking to have the signs removed and left the signs in place.

The evidence does not preponderate against the Trial Court's finding that Mr. Sawyer did not breach the Contract by failing to refer TVA to Re/Max during the term of the Contract. The evidence further shows that the Contract expired on March 2, 2009, and that TVA made its offer to purchase the Properties on March 17, 2009, after the expiration of the Contract. Thus, Re/Max was not entitled to compensation pursuant to paragraph 2 of the Contract. The evidence also shows that Re/Max never negotiated with TVA, showed the Properties to TVA, or introduced TVA to the Properties or to Mr. Sawyer. Furthermore, Ms. Futrell testified that she never gave Mr. Sawyer any notice that Re/Max intended to proceed under the carry over provision of the Contract. Given all this, Re/Max was not entitled to compensation pursuant to the carry over provision in paragraph 5 of the Contract.

Plaintiffs argue in their brief on appeal that "a landowner cannot avoid a commission by taking the negotiations out of the hands of the broker or agent," and cites to *Parks v. Morris*, 914 S.W.2d 545, 551 (Tenn. Ct. App. 1995). In *Parks*, this Court stated:

> Generally, a seller cannot delay consummation of a transaction until after termination of the agency and avoid liability for the commission upon a subsequent sale to the buyer produced by the real estate broker. *Pacesetter [Properties, Inc. v. L. H. Hardaway]*, 635 S.W.2d [382] at 382 [(Tenn. Ct. App. 1981)]. Only where the seller acts in good faith may he sell to a purchaser after the agency terminates without liability for the broker's commission. *Id*.

*Parks v. Morris*, 914 S.W.2d 545, 549 (Tenn. Ct. App. 1995).

The Trial Court did not find that Mr. Sawyer had failed to act in good faith. Instead, the Trial Court found that Mr. Sawyer had not breached the Contract and had acted "as any property owner would have acted under these circumstances by attempting to see what, if anything, TVA planned to do to make the defendants whole after the ash spill had occurred." From the beginning Mr. Sawyer disclosed to Re Max that he was having discussions with TVA and provided TVA with a copy of the Contract. Furthermore, the evidence in the record on appeal reveals that Mr. Sawyer neither did anything to delay TVA's decision about whether TVA would purchase the Properties, nor did he do anything to delay the timing of TVA making an offer on the Properties. Likewise, the proof shows that it was TVA and not Mr. Sawyer who decided that TVA would deal only with property owners and

would not negotiate with any real estate agents such as Plaintiffs. The evidence preponderates in favor of a finding that Mr. Sawyer acted in good faith.

Our determination of Plaintiffs' issue renders the Sawyers' issues moot.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Peggy Giffin d/b/a Re/Max Realty Center, and Racia Futrell, and their surety.

_____
D. MICHAEL SWINEY, JUDGE