# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 2, 2012 Session

## GATLINBURG ROADHOUSE INVESTORS, LLC., v. CHARLYNN MAXWELL PORTER, et al.

**Appeal from the Chancery Court for Sevier County**
**No. 09-8-379     Hon. Telford E. Forgety, Jr., Chancellor**

---

### No. E2011-02743-COA-R3-CV-FILED-DECEMBER 20, 2012

---

In this action plaintiff charged defendant had breached the contract between them and sought specific performance. The Trial Court held the contracts were ambiguous and construed them in accordance with the actions the parties took in regard to the contracts. The Trial Court ruled in favor of the defendant and dismissed the Complaint, but refused to award the prevailing party attorney's fees as was required in the parties' contract. On appeal, we affirm the Trial Court's Judgment, but modify and remand, with instructions to the Trial Court to award the prevailing party her attorney's fees.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed, as Modified.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., and JOHN W. MCCLARTY, J., joined.

Howard B. Jackson, Knoxville, Tennessee, for the appellant, Gatlinburg Roadhouse Investors, LLC.

Kevin C. Stevens and Briton S. Collins, Knoxville, Tennessee, for the appellee, Charlynn Maxwell Porter.

# OPINION

## Background

This appeal requires this Court to construe a contract. Appellant, Gatlinburg Roadhouse Investors, LLC (GRI), filed a Complaint against appellee, Charlynn Maxwell Porter, alleging breach of contract and seeking specific performance. The contract at issue is a commercial sublease on a parking lot that is associated with the Texas Roadhouse restaurant in Gatlinburg, (Commercial Sublease or Parking Lot Sublease). Prior to the time that the suit was filed, GRI owned and operated the Texas Roadhouse in Gatlinburg and Ms. Porter held a substantial interest in GRI. Ms. Porter also holds a lease on a parking lot adjacent to the Texas Roadhouse that she subleased to GRI for the use of the restaurant. The current amount of rent was set in connection with a 2006 settlement of a lawsuit between the current owner of GRI, Robert McManus, and Ms. Porter, wherein, among other things, Mr. McManus bought Ms. Porter's interest in GRI.

The parties first entered into the Parking Lot Sublease in January 2001. Section 1.06 of the sublease provided for an initial "annual base rent" and was set by the terms of the sublease at $100.00. The sublease provided for adjustments to the rent every five years through 2025. In March 2006, the parties entered into an Amendment of Commercial Sublease that deleted section 1.06 from the original sublease and inserted a new section 1.06 that provided that as of March 31, 2006 the "annual base rent" would be $70,000 for the next two years and then would be increased to $87,500 for the next three years. The Amendment further provided for periodic adjustments to the rent through 2025. Both the original Commercial Sublease and the Amendment of the Commercial Sublease state that the rent is "[s]ubject to the condition subsequent set forth in Section 1.07 of the Commercial Sublease. Section 1.07 of the Commercial Sublease **Revisions to Rent on Condition Subsequent** provides:

> The provisions of this Lease as to the rent payable are subject to revision as follows:
>
> > (a) In the event the ownership of Texas Roadhouse Restaurant to be operated by Tenant [GRI] on the adjoining property under the Parkway Sublease [Parking Lot Sublease] is subsequently sold or transferred to any third-party, including, without limitation, the restaurant franchisor, or in the event the Landlord [Porter], or her heirs, or legal representatives, cease to own a membership interest in Texas Roadhouse of Gatlinburg, LLC, its successors and/or assigns, then the revisions to the rent set forth in subsection (b) below shall automatically and immediately become effective on the first day of the sixth (6th) month following the date of the sale or transfer of the restaurant or

the date Landlord's said membership interest ceases (herein the **"Revision Date"**).

(b)   The Annual Base Rent set forth in Section 1.06 (a) and (b)(1) shall be revised to equal the annual fair market value of the Demised Premises as determined by an independent commercial real estate appraiser licensed and certified in the State of Tennessee who shall be selected by a panel of two (2) appraisers meeting the same qualifications, one (1) appointed by the Landlord and one (1) appointed by the Tenant, and whose decision as to the fair market value of the Demised Premises shall be final and binding on the parties, and with all appraiser's fees paid by Tenant.

### The Case

The Complaint states that in the summer of 2008 the restaurant was sold by GRI to the national franchisor but that "no land or building lease was sold."   Robert McManus, the Chief Manager of GRI, sent Ms. Porter a letter on September 8, 2008 in which he invoked the rent modification procedures set out in Section 1.07 of the Parking Lot  Sublease.  Ms. Porter responded to this letter with a refusal to engage in the appraisal  procedure set out in Section 1.07.   The Complaint alleged that by refusing to comply with Section 1.07, Ms. Porter was in breach of the Parking Lot Sublease and that GRI was entitled to specific performance with respect to the modification of lease set out in Section 1.07.

On February 19, 2010, Ms.  Porter filed an Answer and Counterclaim.  The Answer denied the allegation that the rent due under the Parking Lot Sublease was subject to further modification pursuant to Section 1.07.   She asserted that Section 1.07 was intended for her benefit and that she did not consent to its invocation under the circumstances.  Ms. Porter further denied the allegation that the restaurant was sold to the national franchisor and stated that no lease was sold or transferred.  In response to this allegation Ms. Porter averred:

It is affirmatively averred that in 2008, GRI presented Porter with a Confidentiality Agreement regarding approval of a future sublease by Porter.  Bruce Maples ("Maples") was the original lessor of the subject property to Porter.  Discussion then ensued regarding the transaction proposed by GRI.   During these discussion, representatives of Texas Roadhouse and McManus a/k/a GRI represented that no assignment or transfer would take place and that Maples' approval of the sublease was therefore not required and representatives of GRI represented that there would be no change in relationship between GRI and Porter and that payments would continue to be made from GRI to Porter as they had since the modification in March of 2006.  GRI and Texas Roadhouse presented to and obtained Porter's execution of

an agreement stating that rent on the parking lot was $87,500.00.

The Answer further denied that the sale of the restaurant was a "condition subsequent" referenced in Section 1.07 and that she was in breach of the lease. She raised the affirmative defenses of failure to state a claim upon which relief can be granted and that specific performance is not available to GRI under the facts alleged. She further pled the affirmative defenses of unclean hands, waiver, estoppel, laches, failure of consideration, fraud, misrepresentation and mistake.

Ms. Porter also filed a Counterclaim against GRI for declaratory judgment, damages and equitable relief. The Counterclaim alleged that Ms Porter and Mr. McManus formed GRI in 2000 after Mr. McManus approached Ms. Porter about becoming a significant owner in a Texas Roadhouse franchise restaurant located in Gatlinburg. Mr. McManus was interested in bringing Ms. Porter into the business as she held a lease on a prime piece of property in downtown Gatlinburg that would be an ideal location for the restaurant. Porter also held a lease on an adjoining parcel that could function as the restaurant's parking lot. According to the Counterclaim, Ms. Porter was a substantial, but minority, owner of GRI with a 46.5% Financial Interest and a 49% Governance Interest in the LLC. Mr. McManus was the Chief Manager of GRI and Road Ho Management, LLC, an entity owned and controlled by him, was the controlling member of GRI with a 48.5% Financial Interest and a 51% Governance Interest. Ms. Porter claimed that she agreed to lease the parcel of land on which the restaurant is located to GRI for rent substantially lower than market value based on the promises and assurances of Mr. McManus that she would earn generous profits and distributions as a co-owner of GRI. Likewise, she leased the parking lot adjacent to the restaurant to GRI for a token annual rent of $100.00. The sublease of the parking lot provided her with the right to revise the rent if (a) the ownership of the restaurant was subsequently sold or transferred by GRI or (b) Ms. Porter ceased to own a membership interest in GRI. Ms. Porter alleged that the conditions triggering revision of the rent due to her by GRI were included in the sublease of the parking lot for her sole protection and benefit in the event she disassociated from GRI and was thereby deriving no further benefit from GRI. She stated that in such an event, she and Mr. McManus agreed that it would be fair and appropriate for her to receive a fair market value rental rather than the token rent of $100.00 a year.

The Counterclaim goes on to state that a dispute arose over the management of GRI between Ms. Porter and Mr. McManus and that Ms. Porter filed a lawsuit against McManus and several entities over which he had control. The parties settled the lawsuit in February, 2006 by executing a Purchase of Interest Agreement whereby Porter agreed to sell her interest in GRI to McManus. Ms. Porter contended that the Purchase of Interest Agreement was effective on February 8, 2006, at which time the rent revision provision in the Parking

Lot Sublease was triggered. Pursuant to the rent revision provision, the parties agreed to replace the $100.00 token annual rent for the parking lot with an agreed upon fair market value of $70,000 per year from April 1, 2006 through March 31, 2008 and $87,500 per year for the next three years after March 31, 2008. The Purchase of Interest Agreement also stated that after March 31, 2011 rent for subsequent years "shall be adjusted upward as provided in Section 1.06(b) of the Lease." Pursuant to the Purchase of Interest Agreement, Mr. McManus did purchase Ms. Porter's interest in GRI on March 10, 2006 and the rent was paid as per the modification.

The Counterclaim further states that in early 2008 Texas Roadhouse Holding (TRH) and GRI presented Ms. Porter and Bruce Maples, the original lessor of the property to Ms. Porter, with a Confidentiality Agreement seeking their approval of a sub-sublease. Ms. Porter claims that during the discussion about the approval of the sub-sublease, TRH representatives and McManus, for GRI, made several representations to her. They stated that as no assignment of transfer would take place, the land owner, Maples' approval of the sub-sublease was not required. Ms. Porter also claimed that "representatives of GRI represented that there would be no change in relationship between GRI and Porter and that payments would continue to be made from GRI to Porter as they had since the rent modification in March of 2006." Ms. Porter stated that GRI and TRH presented to her and she executed an agreement stating that the rent on the parking lot was $87,500.00 annually. Ms. Porter avers that in reliance of the statements and assurance made to her by TRH and GRI, she approved the sub-sublease from GRI to TRH. In July 2008, TRH subleased the Restaurant Lease and the Parking Lot Lease from GRI and all parties stipulated to the rentals due to Ms. Porter. Based upon the foregoing representations and assurances that no transfer of the restaurant from GRI was occurring, Ms. Porter contends that GRI remained an active entity that is liable to Ms. Porter under the Restaurant Lease and the Parking Lease and has continued to make rent payments to her. According to the Counterclaim, however, contrary to Ms. Porter's contentions, Mr. McManus and GRI now claim that the sub-sublease to Texas Roadhouse was a sale or transfer such that the rent revision provision in the original Parking Lease was triggered again.

Ms. Porter alleged that if GRI contemplated that it was entitled to modification of the rent as a result of obtaining her consent to a sub-sublease between GRI and TRH, then material information about the transaction was tortiously withheld from her. Further, Ms. Porter stated that had GRI not given the assurances and made the representations to her, she would not have approved or consented to the GRI/TRH sub-sublease documents. Based on this failure to provide her with material information, Porter contended that she is entitled to rescind her approval of the July 2008 sublease to Texas Roadhouse.

Ms. Porter stated that the rent revision provision in the Original Parking Lot Sublease

could only be triggered once and the triggering event occurred when the Purchase of Interest Agreement was executed by herself and McManus on February 8, 2006. Thus, she is entitled to a decree of specific performance requiring Mr. McManus to "take steps to execute any and all but [sic] agreements or papers necessary to effectuate the terms of the Purchase of Interest Agreement. She further averred that McManus/GRI is estopped from attempting to obtain a revision of the fair market value rental already agreed upon by the parties. Further, she averred that McManus/GRI cannot now, over two years after she left GRI, force her to involuntarily invoke a provision in the original Parking Lot Sublease that was created solely for her benefit. She asked the Court to interpret the Amended Parking Lot Sublease in accordance with the actions of the parties in establishing the rent at the time she sold her interest in GRI. Alternatively, in the event GRI is found to be entitled to compel some adjustment of the rental for the parking lot lease to fair market value, the fair market value for the rental of the parking lot was established by the GRI rental to TRH current and future. Thus, Ms. Porter claimed she is entitled to have the rent for the parking lot established at the same amount TRH pays GRI. Alternatively, Ms. Porter asked for a reformation of documentation to conform to the Purchase of Interest Agreement, or alternatively rescission of her approval of the 2008 sublease from GRI to TRH.

GRI filed an Answer to the Counterclaim and Mr. McManus filed his Answer to the Third Party Counterclaim.

GRI filed a Motion to Amend and an Amended Complaint. The Amended Complaint did not state a new cause of action but did amend plaintiff's prayer for relief. It asked for an order that requires specific performance of the contract by Ms. Porter retroactive to the date of her alleged breach of contract, September 8, 2008. Alternatively, in the event specific performance is not awarded, plaintiff asked for an award of damages sufficient to place it in the position it would have been if Ms. Porter had not breached the contract. Ms. Porter likewise filed a Motion to Amend Answer and Counterclaim and for Leave to Add Appropriate Third Parties on May 17, 2011. The Motion to Amend was based on the recent discovery of new facts about the agreement between GRI and TRH. TRH and Robert McManus were eventually made Third Party Defendants. The Trial Court granted both Motions to Amend.

The matter was tried before the Chancellor, and a Final Judgment was entered on November 30, 2011. The Trial Court held that GRI was not entitled to seek a revision to the rent and dismissed all claims made by GRI. Based on the dismissal of GRI's Complaint, the Trial Court dismissed Ms. Porter's Counterclaim against GRI and the Third-Party Complaints against TRH and Robert McManus. The costs were assessed to GRI and all parties' requests for attorney's fees were denied. A Memorandum Opinion was attached to the Final Judgment.

GRI filed a Notice of Appeal, and raised these issues on appeal:

A.      Whether the Trial Court erred by not enforcing the rent revision provision of Section 1.07 of the Parking Lot Sublease based on its finding that Section 1.07 was ambiguous.

B.      If Section 1.07 is ambiguous, did the Trial Court err when it did not construe the ambiguity against the drafter?

C.      Whether the Trial Court erred when it held that GRI was estopped from enforcing Section 1.07 of the Parking Lot Sublease?

D.      Whether the Trial Court erred when it ignored Section 7.01 of the Parking Lot Sublease?

E.      Whether the Trial Court erred by denying Ms. Porter's request for attorneys' fees? (Issue raised by Appellee)

A trial court's findings of fact in a non-jury trial are reviewed *de novo* upon the record. The trial court is afforded a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13 (d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995). This Court reviews credibility determinations made by the trial court with great deference. *Keaton v. Hancock County Bd. of Educ.,* 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003). Thus, the trial court is in the best position to resolve factual issues that hinge on credibility and the appellate court will not re-evaluate a trial court's assessment of a witness's credibility absent clear and convincing evidence to the contrary.

The trial court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005)*, Union Carbide Corp. v. Huddleston* 854 S.W.2d 87, 91 (Tenn. 1993).

In this appeal, the Court is tasked with interpreting the terms of a contract, the Parking Lot Sublease and the Amended Parking Lot Sublease, entered into by appellant, GRI and appellee, Ms. Porter. This Court set out the well settled rules of contract interpretation in *Kafozi v. Windward Cove, LLC,* 184 S.W.3d 693 (Tenn. Ct. App. 2005)(appeal denied Jan. 30, 2006) as follows:

In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.,* 78

S.W.3d 885, 889–90 (Tenn.2002)(citing *Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 95 (Tenn.1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.,* 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts,* § 24.30 (rev. ed.1998); *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.,* 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am.Jur.2d, *Contracts,* § 245).

This Court's initial task in construing the Contract at issue is to determine whether the language of the contract is ambiguous. *Planters Gin Co.,* 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id.* A contract is ambiguous only when its meaning is uncertain and may *fairly* be understood in more than one way. *Id.* (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the parties. *Id.* Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id.*

*Kafozi*, at 698-99.

An ambiguous provision in a contract generally will be construed against the party drafting it. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006)(citing *Hanover Ins. Co. v. Haney,* 221 Tenn. 148, 425 S.W.2d 590, 592 (1968); *Vargo v. Lincoln Brass Works, Inc.,* 115 S.W.3d 487, 492 (Tenn. Ct. App.2003)).

The parol evidence rule provides that parol evidence "is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous, absent fraud or mistake or any claim or allegation thereof." *Bradford v. Sell,* 240 S.W.3d 834, 838 (Tenn. Ct. App. 2007)(citing *Airline Const. Inc. v. Barr,* 807 S.W.2d 247, 259 (Tenn. Ct. App.1990); 32A C.J.S. *Evidence* § 851 at 213 (1974); Tenn. Code Ann. § 47–2–202. However, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract. *Watson* at

612 (citing *Memphis Housing Auth. v. Thompson,* 38 S.W.3d 504, 512 (Tenn.2001); *Fidelity–Phenix Fire Ins. Co. of New York v. Jackson,* 181 Tenn. 453, 181 S.W.2d 625, 631 (1944); *Vargo,* 115 S.W.3d at 494). To aid the court's discernment of the parties' intention, however, the parol evidence rule does not prohibit the court from considering the circumstances surrounding the formation of the contract, the business to which the contract relates, and the construction placed upon the contract by the parties in carrying it out. *Adkins v. Bluegrass Estates, Inc.,* 360 S.W.3d 404, 412 (Tenn. Ct. App. 2011), appeal denied (Dec. 14, 2011)(citing *Healthmart USA, LLC v. Directory Assistants, Inc.,* No. M2010–00880-COA- R3- CV, 2011 WL 1314662 at \*2 (Tenn. Ct. App. April 6, 2011)).

Appellant contends that the Trial Court was in error when it did not enforce the rent revision provision of Section 1.07 of the Parking Lot Sublease based on its finding that Section 1.07 was ambiguous. The Trial Court found that an ambiguity existed as to whether the rent revision procedure in Section 1.07 of the Parking Lot Sublease could be triggered only once, as Ms. Porter contended, or whether it could be triggered multiple times, which was the position supported by GRI. The Trial Court determined that both interpretations of Section 1.07 were reasonable, thus the provision was ambiguous. The Trial Court also had a problem with the exact meaning of the second occurrence that could trigger a rent revision in 1.07 - the "sale" of the Texas Road House restaurant. Section 1.07 provides:

> (a) In the event the ownership of the Texas Roadhouse Restaurant to be operated by the Tenant [GRI] on the adjoining property under the Parkway Sublease [Restaurant Lease] **is subsequently sold or transferred to any third-party, including, without limitation, the restaurant franchisor**, or in the event the Landlord [Porter], or her heirs or legal representatives, cease to own a membership interest in Texas Roadhouse of Gatlinburg, LLC [later GRI], its successors and/or assigns, then the revisions to the rent set forth in subsection (b) below shall automatically and immediately become effective on the first day of the sixth (6ᵗʰ) month following the date of the sale or transfer of the restaurant or the date Landlord's [Porter's] said membership interest ceases (herein the "**Revision Date**").

(emphasis added).

The Trial Court was concerned by what was meant by the sale of the restaurant. The Court stated in its Memorandum Opinion that there is no definition in the document for "sold", "transferred" or "sale of the restaurant." The Court noted that GRI's interpretation of the provision was that "a sale means a sale of assets such as furniture, fixtures, goods, equipment . . . along with the sublease" and "the right to operate the business." On the other hand, the Court noted that Ms. Porter's position was that an actual "sale" had not occurred as GRI was still deriving profits from the business by way of rent under the sub-

sublease to TRH and GRI still owned the building the restaurant was housed in. Thus, GRI was paying taxes and insurance premiums and deriving profits from the business after the transaction between GRI and TRH that was a purported "sale". The Trial Court found that both parties' interpretation was a "possible reasonable construction" and, thus, concluded that the "sale" trigger of the rent revision in Section 1.07 was ambiguous.

The Trial Court noted a seeming conflict between the Parking Lot Sublease and the Interest Purchase Agreement in which Ms. Porter sold her interest in GRI to Mr. McManus as part if the settlement of the lawsuit. The Court noted that under the terms of the Interest Purchase Agreement, the rent Ms. Porter received from GRI under the Parking Lot Sublease could be adjusted from time to time "upwardly". However, the Amended Sublease of March 10, 2006, also a part of the settlement, which revised the rent from $100.00 a year under the original sublease to a much larger yearly rent, did not limit a future revision of the rent to upward. The Court stated that the documents, both part of the same transaction, . . . "are in conflict, because the one says that the rent can be revised upwardly, the other one says it can be revised but does not limit it to a revision upwardly. . . . [T]hey are internally in conflict. One says rent can only go up, the other one, at least by implication, says rent can go down if the appraisal indicates that it should." Based on these findings of ambiguity, the Trial Court looked to the actions of the parties to resolve the ambiguity.

We agree with the Trial Court when it held that Section 1.07 of the Parking Lot Sublease was ambiguous as it could reasonably be construed in two opposite ways. The plain language of Section 1.07, supports Ms. Porter's position that the provision for rent revision is a one time only event that would occur if the restaurant was sold **or** if Ms. Porter was no longer an interest holder in GRI. The use of the word **or** indicates that the rent revision provision is triggered once if **either** Ms. Porter no longer has an interest in GRI **or** the restaurant is sold. *See Black's Law Dictionary*, 5th Ed., p. 987, ("**Or** - a disjunctive particle used to express an alternative or to give a choice of one among two or more things." )

However, despite the plain language of Section 1.07, GRI's interpretation of the Section is likewise reasonable. Ms. Porter and GRI agreed to part ways as part of the settlement of the lawsuit Ms. Porter had brought against GRI. Thus, Ms. Porter sold her interest in GRI to Mr. McManus and, as provided by Section 1.07, the rent under the Parking Lot Sublease was revised. The parties decided not to avail themselves of an appraisal to determine fair market rent, but rather they negotiated the rent revision among themselves. An Amended Parking Lot Sublease states the new negotiated rent under the Parking Lot Sublease, and expressly makes reference to Section 1.07 of the original Parking Lot Sublease and states at the new Section 1.06 that " [s]ubject to the condition subsequent set forth in Section 1.07 . . . ." Thus, even though Section 1.07 had been triggered by Ms. Parker's sale of her share of GRI, as part of that same transaction, the parties seem to have agreed that

-10-

Section 1.07 could be triggered again. Accordingly, GRI argues that Section 1.07 was still in place in July 2008 when GRI sold the restaurant to TRH and a revision of the rent agreed to under the Amended Parking Lot Sublease was possible. Both parties' interpretation of Section 1.07 is reasonable and, as they are in conflict, Section 1.07 is ambiguous. Accordingly, the Trial Court correctly held that, based on the ambiguity, it would look to the conduct of the parties to resolve the ambiguity.

The Trial Court found that based on the action of the parties following the rent revision made in the 2006 Amended Parking Lot Sublease, "the parties . . . treated this rent revision appraisal procedure duty as no longer being applicable, as being something that simply no longer applied." After reviewing the testimony presented at trial and the documents presented as exhibits, we agree with the Trial Court's assessment. The Trial Court found it compelling that GRI's attorney, James Parris, told Ms. Porter's attorney, Jack Tallent, that nothing was going to change as a result of the transaction between GRI and TRH - that all that was going to happen was that TRH was going to pay rent to GRI and GRI would continue to pay rent to Ms. Porter. Further, we note that Ms. Porter testified that Mr. Houser, a minor partner in GRI and manager of the restaurant, talked to her about her consent to GRI sub-subleasing the parking lot to TRH. Ms. Porter stated that during that conversation, Mr. Houser assured her "nothing was going to change." She likewise was assured by Mr. Hart, CEO of TRH, that "nothing else was changing, everything would remain the same". Ms. Porter stated that based on the assurances of Mr. Houser and Mr. Hart that nothing was going to change with regard to her sublease and the fact that the sub-sublease (between GRI and TRH) showed rent schedules that were the same as the amended sublease, she believed that the rent would stay the same as it had been under the amended sub-lease. Based on these representations she consented to the sub-sublease.

The Trial Court also found it compelling that GRI's financial statements, including the 2008 financial statement issued the day before the closing with TRH, projected and recognized what GRI's rentals to Ms. Porter would be in the future, and that the numbers were the exact numbers contained within the rent schedule of the Amended Parking Lot Sublease. This Court notes that GRI's 2008 financial statement continues to reflect rent payments and receipts through 2025 in accordance with the agreed upon rent scheduled of the Amended Parking Lot Lease, with no indication that a change in those scheduled rents was expected because of the 2008 transaction between GRI and TRH.

The Trial Court observed GRI's actions when it went back to TRH and sought to revise the rent payments due under the Sub-Sublease as a result of an error or discrepancy in the numbers when the document was originally drafted. The Trial Court noted that the rent under the Sub-Sublease did not take into account that there were escalators in the rent that GRI would pay to Ms. Porter. Thus, GRI would eventually be receiving less rent under

the Sub-Sublease than it was obligated to pay Ms. Porter. The Court stated that it was never the intent of any of the parties that GRI would pay more to Ms. Porter than TRH paid to it. TRH agreed to an adjustment to the rent in the Sub-Sublease so that it mirrored the rent in the Parking Lot Sublease. The corrections were made and GRI projected what the rent would be under the Sub-Sublease out to 2025. The Trial Court found that GRI's and TRH's actions were indicative of the parties intent that the rents under the Sublease and Sub-Sublease were to mirror each other and that the rent under the Sublease could not be revised pursuant to Section 1.07.

Under these factual findings, the Trial Court concluded:

[I]t appears that the parties treated this rent revision appraisal procedure duty [in Section 1.07] as no longer applicable, as being something that simply no longer applied and that the rent . . . could be calculated and was calculated, not once but multiple . . . times . . . all the way out to the year 2025, which the only way you can do that . . . Is to assume that it's not going to change. And there was no notation, for example in the financial statements . . . that . . . these are subject to revision. Rather, they were just straightforwardly projected all the way out to the end of the lease terms. So it seems to the Court that both sides treated this - - rent revision procedure, appraisal procedure as no longer being applicable.

We agree with the Trial Court's factual findings that the parties actions support Ms. Porter's contention that the parties no longer considered Section 1.07 of the Sublease applicable in 2008. Mr. McManus did testify that it was always his intent to revise the rent once GRI sold the restaurant, however, this Court gives great deference to a trial court's determination of the credibility of the witnesses. In this case, we defer to the Trial Court's finding that Mr. McManus' testimony on this issue was not credible. *See Keaton v. Hancock County Bd. of Educ.,* 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003); *Hopper v. Moling*, No. W2004-02410-COA-R3-CV, 2005 WL 2077650 at *7, (Tenn. Ct. App. Aug. 26, 2005)(citing *State v. Pruett,* 788 S.W.2d 559, 561 (Tenn. 1990).

We hold the Trial Court did not err when it did not enforce Section 1.07 of the Parking Lot Sublease.

Appellant contends that if there was any ambiguity as to whether the 2008 transaction between GRI and TRH was a sale, the ambiguity should be construed against Ms. Porter, as the drafter of Sections 1.06 and 1.07. *See German v. Ford*, 300 S. W. 3d 692, 704 (Tenn. Ct. App. 2009)(doubtful language in a contract is construed against the party who drafted the contract, especially where the drafting party seeks to use the language to defeat its operation). However, we do not rely on the Trial Court's finding that Section 1.07's reference to the sale

of the restaurant is ambiguous because "sale" is not defined in the lease. Rather, we affirmed the Trial Court's holding that the parties actions confirm that they did not mean for Section 1.07 to be in effect in 2008. In doing so, we agreed with the Trial Court's finding that Section 1.07 reasonably could be construed to mean that the sale of the business or Ms. Porter's loss of interest in GRI could trigger the rent revision provision either on a one time basis or that the rent revision provision could be triggered more than once, as GRI contended. Since we agreed with the finding of ambiguity, we also agreed with the Trial Court's decision to exam the actions of the parties to determine their intent. We have not based our affirmation of the Trial Court's judgment on whether Section 1.07's reference to the sale of the restaurant is ambiguous. This issue is moot on appeal.

Appellant contends the Trial Court erred when it held that GRI was estopped from enforcing Section 1.07 of the Parking Lot Sublease. The Trial Court held that GRI should be estopped from invoking the rent revision provision in Section 1.07 of the Parking Lot Sublease because GRI made misrepresentations to both TRH and Ms. Porter. Again, we affirmed the Trial Court's holding that, based on the actions of the parties, they did not intend the rent revision provisions of Section 1.07 to be applicable and in force in 2008. Accordingly, we do not consider the Estoppel issue raised on appeal.

Appellant contends the Trial Court erred when it ignored Section 1.07 of the Parking Lot Sublease. This issue is moot, as we have affirmed the Trial Court's holding that based upon the action of the parties they did not intend the rent revision provision of Section 1.07 to be applicable and in force in 2008.

Appellee contends the Trial Court was in error when it denied her request for an award of attorneys' fees despite a provision in the Parking Lot Sublease that entitled her to such an award. Section 15. 10 of the Parking Lot Sublease provides:

The non-prevailing party shall pay all reasonable costs and expenses, including attorneys' fees and court costs, that shall be made or incurred by the prevailing party in enforcing the terms and conditions of this Lease.

Ms. Porter is the prevailing party in this matter as all claims to enforce the lease and for specific performance made by GRI against her were dismissed and she requested attorneys' fees in her Counterclaim. However, the Trial Court denied her request for attorneys' fees. The Trial Court stated:

I will not award attorney fees rightly or wrongly from a legal perspective. I will not award attorney's fees. The problem here is you had all sort of ambiguity, and the ambiguity in the Interest Purchase Agreement and the amendment to the sublease, you

-13-

had the original ambiguity about the sale of the restaurant which I held is an ambiguity. That's what I think, so you are going to enforce the terms of a document, you are going to award attorney fees for enforcement in terms of a document that's so ambiguous that each side in my opinion had a reasonable basis for their argument of what the terms of the lease was. So I don't think it's appropriate to award attorneys fees, and therefore I do not.

Tennessee law allows for parties to contract for the recovery of attorney's fees as an element of damages. *Am. Bonding Co. v. Vaughn,* M2010-02464-COA-R3CV, 2011 WL 3903316 at * 6 (Tenn. Ct. App. Sept. 2, 2011)(citing *Cracker Barrel Old Country Store, Inc. v. Epperson,* 284 S.W.3d 303 (Tenn.2009)). A trial court does not have discretion to refuse to consider the provision of a contract awarding reasonable attorney's fees. *Am. Bonding Co.* at * 6 (citing *Hosier v. Crye–Leike Commercial, Inc.,* No. M2000–01182–COA–R3–CV, 2001 WL 799740, at *6 (Tenn. Ct. App. July 17, 2001))(finding that the trial court did not have discretion to determine whether to award attorney's fees when the contract provided that the prevailing party was entitle to recover its reasonable attorney's fees). However, the determination of the amount of reasonable attorney's fees is within the trial court's discretion. *Am. Bonding Co.* at * 6 (citing *Albright v. Mercer,* 945 S.W .2d 749 (Tenn. Ct. App.1996).

Here, the lease provided for the non-prevailing party to pay the attorney's fees incurred by the prevailing party in enforcing the terms and conditions of this lease. Although the Trial Court's reasoning in denying Ms. Porter's request for attorneys' fees is appealing, and was an attempt at fairness, the law is otherwise. As a consequence, this Court remands to the Trial Court with instructions to set reasonable attorney's fees for Ms. Porter.

The Final Judgment of the Trial Court dismissing GRI's claims against Ms. Porter is affirmed. The Trial Court's denial of Ms. Porter's request for attorney's fees is modified and remanded with instructions to the Trial Court to determine a reasonable amount of attorneys's fees against the appellant.

The cost of the appeal is assessed to Gatlinburg Roadhouse Investors, LLC.

_____
HERSCHEL PICKENS FRANKS, P.J.