IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 24, 2014 Session

# PRESTON MCNEES SPECIALTY WOODWORKING, INC. ET AL. v. THE DANIEL CO. (DANCO), INC.

Appeal from the Circuit Court for Washington County
No. 30781      Thomas J. Seeley, Jr., Judge

_____

No. E2014-01004-COA-R3-CV - Filed February 13, 2015
_____

This case involves the proper interpretation of a contract between a general contractor and a subcontractor. The trial court determined that the subcontractor was entitled to recover additional sums above the original contract price based on the doctrine of equitable estoppel. The general contractor timely appealed. Having determined that the scope of the parties' contract covered the work in question and that the doctrine of equitable estoppel does not apply in this matter, we vacate the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Bill W. Petty and Micha Buffington, Knoxville, Tennessee, for the appellant, The Daniel Co. (DANCO), Inc.

Thomas D. Dossett, Kingsport, Tennessee, for the appellee, Preston McNees Specialty Woodworking, Inc. d/b/a Preston Woodworking.

**OPINION**

I. Factual and Procedural Background

The plaintiff, Preston McNees Specialty Woodworking, Inc. d/b/a Preston Woodworking ("Preston"), filed the present action against The Daniel Co. (DANCO), Inc. ("DANCO"), seeking compensation for work that Preston performed on a construction project wherein DANCO was the general contractor and Preston was a subcontractor. In

2010, Preston submitted a bid to supply certain woodwork regarding a project for the College of Medicine Student Center at East Tennessee State University. When preparing its bid, Preston relied in part upon the project manual ("Manual") that had been prepared by Fisher + Associates ("Fisher"), the project architect and designer.

The Manual expressly provided for "[s]hop finishing of all natural finish interior woodwork" and stated that "fabrication, including assembly, finishing, and hardware application" should be complete before shipment to the project site. In a section entitled "Shop Finishing," the Manual provided in pertinent part:

> B.     General: Finish architectural woodwork at fabrication shop as specified in this Section. Defer only final touchup, cleaning, and polishing until after installation.

> C.     General: Shop finish transparent-finished interior architectural woodwork at fabrication shop as specified in this Section.

> * * *

> E.     Transparent Finish: Comply with requirements indicated below for grade, finish system, staining, and sheen, with sheen measured on 60-degree gloss meter per ASTM D 523.

> * * *

> 4.     Staining: Match Architect's sample.

Preston prepared and submitted its bid, which consisted of a base amount of $82,961, with an additional $12,605 to be added for three bays of study rooms. Preston's bid stated that "All wood items are sent to field unfinished, ready to stain by others prior to installation." DANCO selected Preston as the subcontractor for the aforementioned work.

On November 22, 2010, Preston and DANCO executed a "Standard Form of Agreement Between Contractor and Subcontractor," otherwise identified as AIA[1] Document A401-1997 ("Subcontract"). This Subcontract provides that Preston will perform the casework and millwork for the project for a total price of $95,566. The Subcontract also provides that the work will be performed "as specified in the Project Manual dated June 18, 2010, Drawings, and addenda thereto, prepared by Fisher + Associates . . . ." The

---

[1]American Institute of Architects.

Subcontract further states:

> 1.1 The Subcontract Documents consist of (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein; (3) Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement; (4) other documents listed in Article 16 of this Agreement; and (5) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.

Article 16 lists no additional documents.

Following execution of the Subcontract, Preston prepared shop drawings, which set out the details regarding the work Preston was to perform. The front page of the shop drawings contains a typed statement by Preston that "trim and plywood to be stained as per provided sample. (Stain sample to follow)." This front page additionally bears the approval stamp of DANCO as well as the approval stamp of Fisher. There also appears a handwritten note, signed by Mr. Fisher, which states: "Wood stain to match approved door sample." DANCO returned the shop drawings to Preston on June 6, 2011, with a transmittal sheet stating, "Wood stain to match enclosed door sample."

Sam Preston, President of Preston Woodworking, testified that when the shop drawings were returned with the notations regarding stain color, he contacted Tom Daniel at DANCO and reminded him that Preston's bid was for unfinished wood. According to Mr. Preston, Mr. Daniel explained that the architect required the woodwork to be shop-finished; Mr. Preston claimed he was previously unaware of this fact. Mr. Preston related that he subsequently submitted a price for this finish work of $13,994, with no negative response from Mr. Daniel. Mr. Preston stated that Preston had not yet begun finishing of the woodwork, such that Mr. Daniel could have opted to accept the additional cost or allow the woodwork to be delivered unfinished for the original contract price.

Preston sent a change request to DANCO on August 21, 2011, wherein Mr. Preston detailed the additional cost of $13,994 to stain and finish the woodwork. Mr. Preston

explained that he discussed this additional cost with Mr. Daniel in great detail. He admitted, however, that the change order was never signed by anyone at DANCO. Preston submitted a stain sample to the architect and received approval for same. Although Preston was instructed to begin installation on August 22, 2011, it was unable to comply due to conditions at the job site. Eventually, Preston's on-site work began on August 29, 2011.

Preston submitted a pay application on August 25, 2011, which included the original contract price of $95,556, plus an addition of $13,994 for the submitted change order.[2] As such, the pay application reflected a total revised contract price of $109,550. Through that pay application, Preston requested a partial payment for its work, which Preston indicated was thirty-eight percent complete. Preston submitted a subsequent pay application on September 23, 2011, demonstrating the original contract price plus additional costs of $21,639 and claiming a total revised contract price in the amount of $117,195. Two subsequent pay applications were sent on October 25, 2011, and November 8, 2011, also reflecting the "revised" contract sum of $117,195. Mr. Preston testified that DANCO was slow in making payments and never questioned the extra charges until approximately November 8, 2011, after Preston's work was substantially complete. Consequently, Mr. Preston sent a memo to DANCO and Mr. Fisher on that date, explaining the additional charges in detail.

Subsequently, on November 15, 2011, Mr. Daniel sent a letter to Mr. Preston, which states:

This letter is in response to your November 7th letter.

As you are aware, none of the change orders you are requesting was approved either verbally or in writing by anyone from our company. The items listed are all within the scope of the work specified in your contract. Therefore, no additional payment beyond the original contract amount will be approved.

DANCO ultimately paid Preston the original contract price. Preston then filed the instant action on August 23, 2012, seeking to recover the unpaid sum of $21,639.

The trial court conducted a hearing on the merits on January 31, 2014, wherein Mr. Preston and Mr. Daniel were the only witnesses to testify. At trial, Mr. Daniel maintained that he orally informed Mr. Preston on several occasions that Preston would not be paid any sums in excess of the contract price. Mr. Daniel therefore did not feel the need to deny the

_____

[2]Preston erroneously listed the original contract price as $95,556 rather than $95,566 on all pay applications.

charges in writing. According to Mr. Daniel, all of the work requested of Preston was included in the Manual and was part of the original contract. Mr. Daniel pointed to specific provisions in the Manual that included stain as a part of the transparent finish and stated that the stain sample referenced therein was to match the wood doors at the job site. Mr. Daniel indicated that he told Mr. Preston as early as December 2010 that if Preston did not shop-finish the woodwork, Preston would not keep the job and DANCO would hire someone else.

Mr. Preston denied ever being told by Mr. Daniel that the additional charges would not be paid. According to Mr. Preston, he understood transparent finish to be without any stain. He also maintained that there was no stain sample attached to the project manual.

At the conclusion of the trial, the court rendered its opinion from the bench, finding that Mr. Daniel's letter dated November 15, 2011, denying the additional charges, was sent two months after the first change order on August 21, 2011. The court noted that although Mr. Daniel testified he did not feel the need to document DANCO's denial of the change orders in writing because he had conveyed this denial to Preston orally, "the best proof is always documentation . . . ." The court invoked the equitable doctrine of estoppel, finding that it was unfair for DANCO to wait until the work was completed to provide notice that the extra charges would be denied. The trial court accordingly granted judgment to Preston in the amount of $21,639. DANCO timely appealed.

## II. Issue Presented

DANCO presents a single issue for our review:

> Whether the trial court erred by applying the doctrine of equitable estoppel to modify a fully integrated contract.

## III. Standard of Review

Our standard of review is *de novo* with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992). No presumption of correctness attaches to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

We review issues of contract interpretation *de novo*. *See Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). As this Court has previously explained:

In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am.Jur.2d, *Contracts*, § 245).

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005). "Courts must look at the plain meaning of the words in a contract to determine the parties' intent. If the contractual language is clear and unambiguous, the literal meaning controls . . . ." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) (internal citation omitted).

## IV. The Subcontract

DANCO contends that the trial court erred by applying the doctrine of equitable estoppel to modify this fully integrated Subcontract. As noted above, the Subcontract does provide that it contains the entire agreement between the parties and that it is comprised of certain specific documents. Preston's bid is not one of the documents listed in the Subcontract. Further, the Subcontract expressly provides that it "supersedes prior negotiations, representations or agreements, either written or oral." Thus, the bid submitted by Preston prior to execution of the Subcontract, which states that the woodwork would be sent to the job site unfinished, is not part of the Subcontract.

When interpreting a contract, our "initial task is to determine whether the language in the contract is ambiguous." *Ray Bell Cons't Co., Inc. v. Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386-87 (Tenn. 2011) (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). "If the contract language is unambiguous, then the

parties' intent is determined from the four corners of the contract." *Ray Bell*, 356 S.W.3d at 387 (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). This Court has explained the principles applied to determine whether the contract language is clear or ambiguous as follows:

> The language in dispute must be examined in the context of the entire agreement. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id.*

*Vanbebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007). "The parol evidence rule does not permit contracting parties to 'use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) (quoting *GRW Enters. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)).

In the case at bar, the Subcontract expressly states that the work would be performed by Preston "as specified in the Project Manual dated June 18, 2010, Drawings, and addenda thereto, prepared by Fisher + Associates . . . ." Multiple provisions within the Manual declared that the woodwork would be finished in the shop before being delivered to the job site. The Manual further explicitly provided that this finish would include stain to be selected by the architect. Based upon these clear and unambiguous provisions, we determine that the Subcontract provided that Preston would finish the woodwork in the shop before delivering it to the job site. We further determine that such finish was to include stain as specified by the architect. Any parol evidence to the contrary should not have been considered by the trial court.

Having determined that the finishing of the woodwork was addressed and covered by the Subcontract, we conclude that the trial court lacked sufficient basis upon which to employ the doctrine of equitable estoppel. As our Supreme Court has explained:

> The doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:
>
> > (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and

inconsistent with, those which the party subsequently attempts
to assert; (2) Intention, or at least expectation that such conduct
shall be acted upon by the other party; (3) Knowledge, actual or
constructive of the real facts.

*Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990)
(quoting *Callahan v. Town of Middleton*, 41 Tenn. App. 21, 292 S.W.2d 501,
508 (1954) (citation omitted)). Equitable estoppel also requires the following
elements with respect to the party asserting estoppel:

(1) Lack of knowledge and of the means of knowledge of the
truth as to the facts in question; (2) Reliance upon the conduct
of the party estopped; and (3) Action based thereon of such a
character as to change his position prejudicially.

*Id*.

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004). We determine that
several of the above-listed elements are absent in this case. There was no showing that
DANCO falsely represented or concealed any material facts, and there was also no showing
that Preston lacked the means of knowledge of the truth or acted in reliance upon DANCO's
conduct to its detriment. Mr. Preston admitted that Preston had been provided with the
Manual when its bid was prepared, and the Manual expressly required that the woodwork be
finished in the shop before delivery. Preston should not be permitted to complain of surprise
or the alleged necessity of additional costs when this provision was known to it from the
inception of this transaction.

Further, to the extent that the trial court found the additional sums sought by Preston
to be the result of a change in the scope of the original work required, we note that the
Subcontract provides as follow:

The Subcontractor may be ordered in writing by the Contractor, without
invalidating this Subcontract, to make changes in the Work within the general
scope of this Subcontract consisting of additions, deletions or other revisions,
including those required by Modifications to the Prime Contract issued
subsequent to the execution of this Agreement, the Subcontract Sum and the
Subcontract Time being adjusted accordingly. The Subcontractor, prior to the
commencement of such changed or revised Work, shall submit promptly to the
Contractor written copies of a claim for adjustment to the Subcontract Sum

and Subcontract Time for such revised Work in a manner consistent with the requirements of the Subcontract Documents.

It is undisputed that DANCO did not order in writing any changes to the Subcontract. Therefore, the trial court's reliance upon a change order submitted by Preston, which purported to increase the contracted amount, was improper as it was not preceded by the requisite written order from DANCO.

We conclude that the trial court erred in applying the doctrine of equitable estoppel in this situation. The trial court should have enforced the Subcontract according to its plain terms. *See Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (holding that it is the court's duty to enforce contracts according to their plain terms). Because the finish work was required of Preston by the Subcontract, we determine that there was no basis for an award of additional monies to Preston.

## V. Conclusion

For the foregoing reasons, we vacate the trial court's judgment. Costs on appeal are taxed to the appellee, Preston McNees Specialty Woodworking, Inc. d/b/a Preston Woodworking. This case is remanded to the trial court for the collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE